**McCARTY v. UNITED STATES et al.**

**No. A–18905.**

United States District Court
E. D. New York.

Jan. 26, 1950.

Robert McGowan Smith, Brooklyn, N. Y., proctor for libellant (Archibald F. McGrath, New York City, of counsel).

J. Vincent Keogh, United States Attorney, Brooklyn, N. Y., proctor for respondent United States (Dorsey & Adams, New York City, of counsel, and Morgan J. Burke, Jr., and James F. Hart, New York City, advocates).

John P. Smith, New York City, proctor for Guardino Tank Processing Corporation and Guardino & Sons, Inc. (Leo F. Hanan, New York City, of counsel).

Purdy, Lamb & Catoggio, New York City, proctors for Federal Stevedoring Co., Inc. (Edmund F. Lamb, New York City, of counsel).

BYERS, District Judge.

Decision is required concerning an accidental injury suffered by McCarty on June 30, 1947, at about 4:45 P.M. while he was using an abandon ship ladder in making his way aboard the S. S. Council Bluffs Victory from a sludge barge alongside. He was then an employee of Federal Stevedoring Co., Inc., and had been at work on a lighter, also alongside the ship, which lay just forward of the sludge barge, and having knocked off for the day, he was using this means of access to the dock via the ship. Weather conditions played no part in this happening.

That libellant fell as stated, and sustained injuries creating a permanent partial disability, is not in dispute. Nor is it questioned that he was caused to fall from a position on the ladder at the level of the main deck of the ship, because of his being struck by some of that portion of the ladder which extended upward and beyond the main, to and on the boat deck; that was a loop or bight which had been coiled and lashed short of the bitter end which itself was held to pad-eyes in the boat deck. The bight uncoiled because its lashings were removed, and thus it was pulled outboard and down alongside the ship as the result of McCarty's grasping some part of the ladder above the bulwark, while he was in the act of swinging his body over it preparatory to stepping on the main deck.

The critical question of what agency removed or cut loose that lashing of the bight of the ladder is not the subject of any direct testimony, which at once ex-

plains the difficulty of fixing responsibility for that episode. There is also a possible question of whether McCarty elected to use this ladder in preference to a Jacob's ladder which was available to him.

This ship lay bow in, portside to the Huron Street Pier, East River, in the section of Brooklyn known as Greenpoint. She was owned by the United States and was operated by Pacific Atlantic Steamship Company as general agent under the standard form of operating contract. The status of that company in this case is not involved.

Cargo was being discharged into lighters alongside the starboard side of the ship. The discharge was conducted by Federal Stevedoring Co. (hereinafter to be called Federal) under a contract not directly made with the United States, the terms of which are not important since it was conceded that no right of indemnity is now claimed in virtue of that contract. Federal is sought to be held by the Government, if liability is established, upon an asserted common law obligation "to see to it that an injury is not sustained by one of its employees for which the United States might be held ultimately responsible".

McCarty's presence on lighter No. 332, and its position which was taken at 1:00 P.M. on this day abeam of hatch No. 3, have been established without dispute, as is true of a sludge barge operated by respondent Guardino which was next in line toward the stern and alongside the ship, separated from the lighter No. 332 by about 2 or 3 feet.

That sludge barge had been placed in position on June 28th in connection with the work called for by Guardino's contract with Pacific Atlantic, namely, the cleaning of the fuel oil tanks of the ship, which involved rigging a hose from the ship to the barge into which the residue from the tanks was pumped; there the water content was drained off. The ship's pumps furnished the necessary power.

It is that contract upon which the United States relies in asserting its cause against Guardino, again only if the libellant is to recover a decree at all. There are two respondents having that name, but the contract is agreed to have been with Guardino & Sons, Inc., and that company is deemed to be the party involved in this cause, and will be called Guardino.

The terms relied upon (U.S.Ex. 3) are that "The Contractor does indemnify and hold harmless * * * the United States * * * against all suits * * * for * * * personal injury * * * to which the United States * * * may be subject * * * arising or resulting from the fault, negligence, wrongful act or omission of the Contractor * * * its * * * servants, agents or employees".

The legal effect to be given to that engagement is an important issue in this case.

On Saturday night, June 28th, the sludge barge arrived alongside the ship at 7:45 P.M., and Piazza, the foreman of the tank cleaning gang, with the help of his men put this debarkation ladder over the side of the ship, and down to the sludge barge. That is the ultimate fact which is not affected by the conflicting testimony of Piazza and Crawford, the night mate of the ship, and Francis, the night engineer, as to whether such rigging of the ladder was first forbidden and later acceded to by Crawford—involving a second lowering—or not. No finding is required because the conflict is unimportant save as it may bear upon the general accuracy of Piazza's testimony. The bitter end of the ladder was held to the boat deck by being rigged to pad-eyes, inboard of the No. 3 lifeboat.

It is common ground that the ladder was so long that it fell between the sides of the ship and the sludge barge as it was first placed in position, and at the insistence of Crawford it was raised about 10 to 12 feet to avoid damage to the ladder. This shortened the usable length from 35 feet to either 25 or 23 feet, and created the surplus at the top which was stowed either on the main deck according to Crawford, or on the boat deck according to other witnesses. That was the part which fell upon McCarty and caused him to lose his hold

and footing, and to drop some 20 feet or so to the sludge barge.

These conflicting versions must be resolved not only for the sake of clarity, but also in respect of the legal incidents of the duty of supervision of the ladder, its rigging, and its continued use on June 29th and 30th.

The finding will be that the surplus (10 or 12 feet) of the ladder was taken inboard at the boat deck, rolled up, and then lashed by Guardino with rope which it supplied. That rope was 1¼" in diameter, manila, and (as Dreier, the ship's second officer says) it was adequate and well secured in a seamanlike manner.

Further, that this method of rigging the ladder was observed and not objected to or criticised by the officers of the ship during the entire days of June 29th and 30th, up to and including the time of Mc-Carty's accident.

The recital thus far is believed to comprehend matters as to which there is no residual controversy which would survive a consideration of the credible testimony.

Nor will it be disputed that immediately after McCarty's fall it was discovered that the lashing which had bound the coil of surplus ladder, as it lay on the boat deck, was missing.

Whether there were any lashings of the sides of this ladder, to the rail of the boat deck, is not very clear. It is unimportant, however, for the reason that the bitter end of the ladder was lashed to padeyes in the boat deck, as has been stated, and that lashing never carried away. It was not that end which struck McCarty, but the loop of surplus ladder which, when uncoiled, slipped either over the boat deck top rail, or under the bottom rail at the level of the boat deck, which did the damage.

It is a fair inference that, if there had been lashings to the rail of the boat deck (i. e., outboard of the coil), the strain which McCarty put upon the ladder, above the level of the main deck rail, would not have moved the, by then, unlashed portion as it lay upon the boat deck, and hence

that there were no lashings at the boat deck rail.

On this subject the testimony of Second Officer Dreier is relied upon rather than that of Piazza.

The fact that the lashing was missing is not disputed. Why that should have been so, is without excuse exposed in the evidence; it is equally impossible to identify the agency of accomplishment.

As to the entire adequacy of the manner in which the surplus upper 10 or 12 feet was coiled, lashed and stowed on the boat deck, and so held in place during June 29th and 30th prior to the accident, Dreier's deposition and the sketch he made are convincing, albeit he seems to have been mistaken as to the rail on the boat deck (see Stipulation filed January 10, 1950).

No further discussion of the evidence is required, save as the arguments made by the respective parties may suggest.

■ The Government contends, as against Federal, that it owed to its employee McCarty the duty to see that he was provided with a safe place to work, and safe means of access thereto and therefrom, which is a correct statement of the law. If that duty were shown to have been violated, the stevedore would have at least shared responsibility with the ship. Vanderlinden v. Lorentzen et al., 2 Cir., 139 F. 2d 995.

Enough has been said, however, to demonstrate that, as the evidence is presently understood, the ladder was safe and was properly rigged. It did not become unsafe because of any defect, but by reason of a wanton act performed by an unknown person, which cannot be charged to the stevedore. Failure to discover the perpetration thereof could scarcely be visited upon the stevedore, unless the existence of the conditions so created can be shown to have been so obvious, or to have so long continued, as to charge Federal with notice.

■ The mere removal of the lashing around the bight of the ladder is not shown to have caused the part so released to have slipped through or over the boat deck rail.

It was doubtless the strain imposed by McCarty's grasp of the section above the main deck, which caused that part of the ladder to fall outboard. Thus the removal of the lashing would not be manifest except by an inspection on the boat deck. Since the lashing at the bulwark of the main deck was not impaired, it would be unreasonable to hold Federal for not making an inspection on the boat deck, because the ladder had been safely used according to the Guardino witnesses, Piazza and DePietro, as late as 4:00 o'clock on June 30th, which was about forty minutes, before McCarty fell. No reason occurs to me to reject that testimony, even though both witnesses are still in Guardino's employ. They said that they saw the lashings at the main deck and considered them safe. Whether in fact they did is unimportant, for those lashings held. Nothing was shown concerning the use by the stevedore's men of this ladder, and there seems to have been some, that called for inspection by the stevedore foremen on the boat deck. It results that the impleading petition against Federal has failed for lack of proof.

As against Guardino, the Government urges that the use of this abandon ship ladder called into operation the quoted indemnity clause of the contract: "The United States argues that Guardino having appropriated to itself the abandon ship ladder for its own purposes was bound to use all care and caution to see to it that it did not injure anybody."

If this means that Guardino became an insurer of the safety of those, including a stevedore, who might use the ladder, I think it is unsupported in principle or authority. No case is cited in the Government's brief which purports to declare any such rule. The obligation of an employer is to provide a reasonably safe place to work, and the qualification operates according to given circumstances, as a question of fact.

Here the Government eventually and perhaps reluctantly acquiesced in or condoned the use of an abandon ship ladder, rather than a Jacob's ladder. The preference for the latter, however, as the Master's deposition demonstrates, was due entirely to the fear of possible damage to the former and its consequent impairment as a means for emergent leaving of the ship on the high seas; not because it was any the less adequate for access to and egress from the ship by those who moved overside in connection with their work in lightering cargo or cleaning out the deep tanks.

Both Francis and Dreier observed the lashings of the surplus portion of this ladder and tacitly approved of them by taking no contrary action.

Since it was the duty of the ship to supply a safe ladder, and since that duty was performed, the narrow question, as between these two respondents, is whether the removal of the lashings about the coil can be said to have been due to the negligence of either or both.

If it could be shown or reasonably inferred that the removal was accomplished by an employee of Guardino, it would follow that responsibility therefor would rest with it, either because of the act itself, or of omission to prevent its perpetration by proper inspection.

The presence of Guardino's men below the level of both decks, during the time between about 4:00 o'clock and 4:40 P.M. when McCarty fell, has been established according to the testimony, which seems credible enough in view of the nature of their task.

If the officers of the ship who were on duty, namely, the First Officer (deceased), the Second Officer Dreier, or the Assistant Third Officer Ryder, had walked along the starboard side of the boat deck just before 4:40 o'clock, of course the removal of the lashings would have been discovered, and perhaps even the perpetrator would have been identified, but that did not happen.

It should be said that Tormey's testimony has not been overlooked. He followed McCarty up the ladder, and said that he saw a sailor cut the lashings *at the bulwark on the main deck*, just after McCarty fell. In this, I think he was mistaken, as could well happen in the confusion of the moment, for he felt himself

to be in peril; moreover, he is contradicted by Dreier who promptly descended the ladder to the sludge barge upon learning of the accident. Also it is clear that the effect of such cutting loose of the lashings would have been to add to the length of the ladder, the 10 or 12 feet which had been reclaimed by the coil formed on the boat deck, and no one says that occurred. Ryder says: "Nobody could have used this ladder, had there been no lashings holding it, because the ladder had a slack part and with no lashings it wouldn't have held anybody."

There is no other testimony as to any cutting of lashings.

The question of whether negligence on the part of the ship has been shown arises primarily in libellant's case; if it has, the right of the ship to seek indemnity or contribution from Guardino is later to be determined.

■ The ship's duty not only to supply a proper ladder, which concededly it did, but also to maintain it in a safe condition for use, has been declared in this circuit. Grillo v. Royal Norwegian Government, 2 Cir., 139 F.2d 237.

That case involved a ladder which was either defective or became so with usage.

I can perceive no difference in principle between a ladder which became unfit during usage because of wear and tear, and one which became unfit because its lashing was removed, by cutting or otherwise. Either condition would have been revealed on adequate inspection, and thus the question narrows down to the showing in that respect.

■ The ladder was in place as described, and was used by the Guardino crew throughout Sunday, the 29th. Dreier inspected the lashings as to both decks at 8:00 A.M. on that day, and found them proper and sufficient as stated. The same inspection was had on Monday, the 30th, at about the same hour, and with the same result. No other inspection by a ship's officer was had on that day at any time. If there had been one between 4:00 and 4:30 P.M., it is reasonable to conclude that the condition heretofore explained would

have been revealed; and for failure to make such an inspection it seems to me that the ship must be held at fault, i. e., her owner.

If during the day of June 30th the ladder itself had carried away through chafing of the lashings, or wearing out of the side chains, there would be no difficulty in concluding that a failure to inspect must visit responsibility upon the ship; the diffidence which interposes itself, in reaching the same conclusion here, is traceable to the nature of the cause of the failure of the ladder to function, and yet that is probably a distinction without a difference. It is also true that the uncoiling of the bight, which must have resulted from the removal of the lashing around it, would present a more arresting picture than a mere wearing away of a part which might elude any but close examination. Perhaps neither development could fairly be anticipated, and yet the necessity for proper inspection on the part of the ship's officers was clearly present and equally recognized. Capt. Sander said on this subject: "It is the officer's job aboard the ship, to see in case there is a ladder, if it is used, to see that it is properly secured."

That seems to call for more than one inspection a day, and that at 8:00 A.M., which is all that this evidence reveals. I do not think the libellant had to go further and show, for instance, at what precise hour an inspection would have revealed the true condition as it is now known.

On this general subject, it seems to me that there was a studied and suggestive reticence on the part of the ship's officers. There is no showing of any searching investigation immediately following the accident; there is no showing of a serious attempt to trace the lashing that was missing.

The ship's officers were not asked if the ladder continued in use by the Guardino gang *after* the accident. Piazza says it was. If that is true, it would be interesting to know what rope was then used to lash the bight, and who provided it. Nor were the officers asked whether they observed that the lashing, which Dreier said was missing, was actually present on the deck in

short lengths that had been cut, when they made their first inspection after McCarty fell. Piazza testified that such was the fact, both when he was called as a witness for the Government, and later when called by Guardino.

Perhaps no inference is supportable from the testimony of the ship's officers, but no one is forbidden to recall that sailors have been known to carry knives, nor to realize that no one seemed to be particularly concerned with the complete history of the missing lashing.

It is my conclusion that the ship must be held at fault for failure to demonstrate either adequate inspection, or that such inspection would not have availed to prevent the cause of McCarty's fall.

■ As to the respondent Guardino, there is undisputed testimony by Piazza that he looked at the lashing on the boat deck at 4:00 o'clock on June 30th, when he and DePietro went down this ladder to the sludge barge, and that the lashings were in place as they had been for two days. I can advance no reason for refusing to accept that testimony apart from the fact that the witness is in Guardino's employ. I observed nothing in his demeanor on the stand which would justify such a ruling. Accepting that testimony as I do, it follows that Guardino performed the duty of inspecting this ladder and its lashings, which it jointly shared with the ship. No negligence on the part of Guardino being shown, it results that the Government's case against it fails, both as to indemnification and contribution.

As to the libellant's injuries, there is no medical testimony in opposition to that of his witnesses. The nature and extent thereof are found to be as follows: He suffered fractures of the left leg, right shoulder, right leg, spine and ribs. These proved to be partially permanently disabling, and were of course the source of pain and suffering; the healing of the fractures has left him subject to restrictions of movement and function. He cannot resume his occupation as a longshoreman. His earning capacity has not been destroyed, but it has been impaired, and while reemployment in another calling is highly desirable for his own sake at least, it may not be easy of accomplishment, since he is 49 years of age.

■ His loss of wages @ $70.00 per week from the date of accident to the trial is computed at .............. $ 8,700.00
Medical and hospital expenses incurred and to be reimbursed 1,041.00
                      $ 9,741.00
For the injuries themselves and loss of earning capacity, a just award is thought to be .. $25,000.00
      Total ................. $34,741.00

That is the amount which he is entitled to recover.

There remains to consider whether the award should be reduced because of contributory negligence as asserted by the Government. That argument is based upon the theory that McCarty should have chosen to use a Jacob's ladder which is deemed to have been rigged so as to lead from between hatches No. 2 and No. 3 on the ship, down to a barge next ahead of No. 332 on which he was working.

■ As it turned out, McCarty would have been wiser to choose that means of access to the ship in making his way to the dock. If his own barge No. 332 had been placed in position astern of that other barge prior to this afternoon, so that he could be charged with knowledge that the Jacob's ladder was just as accessible as the one he did use leading up from the sludge barge, there might be more to the argument. In either case, he had to go from No. 332 to another craft, and I cannot say that the other choice was a safer one by reason of anything that he could see. There was nothing in the appearance of this abandon ship ladder to warn him of the possibility that the bight in it, which has been discussed, was not secure, or might be expected to carry away as it did. Two companions accompanied him in the movement which led to his fall, which is relevant only to show that he did not start out on a lone enterprise in disregard of

258

the course of his companions. In other words, there is nothing in the evidence to show that he deliberately chose the path of hazard when the course of safety was apparent to him. Shields v. U. S., 2 Cir., 175 .F.2d 743, is cited in this connection, but without factual resemblance.

Mason v. United States, 2 Cir., 177 F.2d 352, also is quoted, and seemingly the argument is that because the pilot in that case—who was caused to fall by the paying out of a Jacob's ladder which he tested only with his weight—was held to have contributed 20% to his injuries, the same reasoning should reduce McCarty's re-covery; i. e., he had not tested the part of this ladder which was between the main deck and the boat deck, before he grasped it above the main deck, thereby causing the bight to be carried outboard. I am unable to see what there was to admonish Mc-Carty that he should do any testing what-ever, once he reached the level of the main deck. In other words, perhaps a higher degree of exploratory caution before using a Jacob's ladder at all is to be exacted of an experienced ship's pilot, than of a long-shoreman who tries a ladder at its lowest point and there finds it secure, when he reaches its lashing at the main deck safely, and before he further trusts it to assist him in swinging over a bulwark. I do not think the evidence would justify a finding of contributory negligence on the part of this libellant.

Settle decree on notice, in accordance with the foregoing. Also findings if de-sired as to factual matters concerning which there may be deemed to be a con-flict in the evidence.