220 F.2d 143
 Gavor MANHAT, Libellant-Appellant,
v.
UNITED STATES of America, and Project Construction
Corporation, Respondents-Appellees-Appellants, and
Project Construction Corporation and
Stuart Marine Painting
Corporation,
Respondents-
Impleaded.
 No. 32, Docket 23089.
 United States Court of Appeals, Second Circuit.
 Argued Dec. 9, 1954.
Decided Feb. 9, 1955.
Writ of Certiorari Denied June 6, 1955.
 
 Harry R. Schwartz, Brooklyn, N.Y. (Louis R. Harolds, New York City, of counsel and on the brief; William L. Standard, New York City, of counsel) for libellant-appellant.
 J. Edward Lumbard, U.S. Atty. for the Southern Dist. of N.Y., New York City (Howard F. Fanning, New York City, of counsel), for respondent-appellee-appellant United States of America.
 Frederick M. Garfield, New York City, (Bigham, Englar, Jones & Houston, New York City, John L. Quinlan, New York City, of counsel), for respondent-appellee-appellant and respondent-impleaded Project Construction Corp.
 Purdy, Lamb & Catoggio, New York City (Vincent A. Catoggio, New York City, of counsel), for respondent-impleaded Stuart Marine Painting Corp.
 Before CLARK, Chief Judge, and SWAN and MEDINA, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 Libellant, an employee of Stuart Marine Painting Corporation, filed a libel in the United States District Court for the Southern District of New York against the United States and Project Construction Corporation to recover damages for personal injuries sustained as a result of the falling of a lifeboat from the United States Naval Ship 'General H. F. Hodges' to a pier on April 5, 1951. The United States, in turn, impleaded Project Construction Corporation and both the United States and Project Construction Corporation impleaded Stuart Marine Painting Corporation, asserting liability over by reason of an indemnity clause in the contract between the parties.
 
 
 2
 Libellant sought to recover on two theories, one cast in terms of negligence and the other in terms of unseaworthiness. The trial court, believing libellant not to be included within the class of persons entitled, under the applicable authorities, to avail themselves of the latter theory addressed its initial findings and opinion to the negligence issue, found that neither the United States nor Project had been negligent and dismissed the libel. In view of the subsequently rendered decision of the Supreme Court in Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, and on consent of all parties, the case was resubmitted for consideration of the unseaworthiness issue. Supplemental findings of fact and conclusions of law were made, and the Court decided that unseaworthiness had not been established and adhered to its former decree that the libel be dismissed.
 
 
 3
 At the time of the accident, the 'General H. F. Hodges' was undergoing certain alterations and repairs which were being performed by Project under a written contract with the United States. Project had sublet the cleaning and painting of the vessel's lifeboats to Stuart and libellant was engaged in cleaning one of these lifeboats when it fell to the pier below with the resultant injury upon which this claim is founded. The accident lifeboat had an aluminum hull, was 27' long, 8' wide, 3-1/2' deep, weighed about 2-1/2 tons and was designed to accommodate 43 persons. When not in use, the lifeboat was secured in its cradle on the boat deck by gripes constructed of 5/8' wire cable. At each end of the boat there was a hook which was designed to engage links which were in turn attached by links and shackles to blocks on the falls. When the accident lifeboat was to be put into the water or over the side its gripes were removed, it was raised from its cradle and swung outboard with its davits by winding the davits outward until the boat reached the position where it would clear the ship's side and was then lowered to the point desired by releasing a brake on the winch. The device by which the falls were released from the two hooks on either end of the lifeboat when the boat was water-borne was a Rottmer-type releasing gear which was operated by the manipulation of a pipelike lever in the lifeboat itself. When the releasing gear was in the secured position, this lever or handle rested on the floorboards of the boat in a keeper consisting of a piece of sheetmetal which was flanged twice, so that the middle portion could be fastened to the floorboards. In each upright member of the keeper there was a hole slightly higher above the floor than the thickness of the releasing handle or lever, through which a toggle pin, attached by a chain to the floorboards of the boat, could be inserted. In order to release the falls from the hooks, it was necessary to remove the toggle pin, seize the releasing lever and manually move it, describing an arc of 165 to 170 degrees. An exertion of a pressure of at least 25-30 lbs. on the releasing lever was necessary to move it in the required arc, when empty, or 40 lbs. with three men aboard. There is substantial evidence in the record to prove that when the Rottmer-type releasing gear is in proper working order, it is virtually impossible for the hooks to open unless the described procedure is followed. The purpose of this releasing gear is to insure the upsetting of the hooks and the detaching of the falls at each end of the lifeboat simultaneously and immediately, when the boat is water-borne.
 
 
 4
 On the morning of the day preceding the accident, the lifeboat was swung out by members of the ship's crew in order that the deck in the vicinity of and under the boat's cradle could be chipped and painted. It remained over the side suspended by its falls until the accident. There is ample evidence to support the trial court's findings that the releasing handle was in the secured position in its cradle at the time the lifeboat was put overside.
 
 
 5
 On the afternoon of April 5, 1951, after libellant had been working on board the 'General H. F. Hodges' for two days and, for the preceding several hours, in other lifeboats on the ship, he was told by his foreman to get into the lifeboat which had been swung out on the previous day, together with two other men, to scrape, dust and paint it. All three men, because of substantial prior experience, were familiar with lifeboats and their releasing gear and were warned by the foreman not to touch the handle. Moreover, the handle was painted red and there was a sign bearing the word 'Danger' above it. At the time the men entered the lifeboat, the foreman observed that the releasing gear handle was still in the secured position in its keeper.
 
 
 6
 Shortly after the three entered the lifeboat, it fell to the pier and, immediately thereafter, the handle was observed to be in the released position, the hooks were open and the falls, their shackles and the links which had engaged the hooks were intact. A 'hog' or upward bend in the pipe of the releasing gear, which ran fore and aft, had been caused by the impact of the lifeboat on the pier, and this 'froze' the gear, thus making it clear beyond peradventure of doubt that the lever had been moved to the release position before the fall.
 
 
 7
 Appellant contends that on this evidence the District Court (113 F.Supp. 599) erred in concluding that 'The doctrine of res ipsa loquitur cannot properly be invoked by libelants against the shipowner in the light of the evidence pointing to the probable cause of the accident and when the instrumentality causing harm was not in the latter's exclusive control.' This contention is without merit. The rule of res ipsa loquitur deals only with permissible inferences from unexplained events, Johnson v. United States, 1948, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468; Jesionowski v. Boston & Maine R.R., 1947, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416 and means simply that, in a given case, the facts of the occurrence warrant the inference of negligence, Sweeney v. Erving, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815. Thus, when the facts disclose that the injured party was not at fault, that the instrumentality causing the injury was in the control of the party against whom the doctrine is sought to be invoked and the occurrence is otherwise unexplained, it is permissible to infer that the party in control was negligent. Johnson v. United States, supra. In the case before us, however, the trial court, after a review of the evidence, concluded that the probable explanation for the accident was that the lifeboat fell because someone in it had moved the releasing handle from the secured position in the keeper to a position of complete release, rather than because of any defect in the apparatus. This conclusion is amply supported by the evidence that, immediately after the accident, the handle was in the release position, the hooks were open, the falls, shackles and links which had engaged the hooks were intact, that the lifeboat and its gear had satisfactorily been put through a 'man overboard' test on March 15, 1951 and had been inspected again on March 19, 1951, and that it had remained suspended without mishap for more than 24 hours before the accident and for approximately 15 minutes after the workmen had boarded her. Expert testimony to the effect that manual movement of the handle was necessary, that the added weight resulting from the entry of the three workmen could not possibly have caused the lever to move even if the toggle pin had, in some way, become dislodged, and that the description of an arc of less than the required dimension would not open the hooks, effectively precluded any finding that the lever shifted by itself or was inadvertently jostled or hit to the release position while the lifeboat was being cleaned. Accordingly, the trial judge properly refused to apply the doctrine of res ipsa loquitur, as libellant's contention that this doctrine was applicable was based upon the assertion that none of the men in the lifeboat moved the lever; and this assertion rested solely on the testimony of the workmen, which the trial judge refused to credit.
 
 
 8
 For substantially the same reasons, libellant's contention that the trial court erred in refusing to infer from the fact of the occurrence that the releasing gear was in an unseaworthy condition, must also fail. It need hardly be pointed out that before strict liability for unseaworthiness can attach, the ship or appliance in question must be shown to have been unseaworthy, Grillo v. United States, 2 Cir., 1949, 177 F.2d 904, and the very same matter which led the court to the conclusion reached with respect to the probable cause of the accident, lends substantial support to its finding that the lifeboat and its equipment were in proper order, free from defect and in all respects seaworthy at the time libellant went aboard. The cases relied upon by appellant indicate, at most, that given the existence of an unseaworthy condition, it is immaterial that the defect was not discernible on diligent inspection, or that absent any more plausible explanation for the occurrence, it may be inferred that the vessel or the appliance in question was unseaworthy. As the apparatus was in proper working order and free from any defects by way of design or otherwise and the precipitation of the lifeboat to the pier was caused by the carelessness of one of the painters, the trial court was compelled to find as it did that the machinery was in all respects properly constructed and maintained and that nothing about the apparatus itself justified an inference of unseaworthiness; and none of the authorities cited holds anything to the contrary.
 
 
 9
 Having disposed of libellant's contentions relating to defects in the releasing apparatus itself, we must examine a second theory upon which liability for negligence and unseaworthiness is asserted. It is claimed that the failure to employ additional safety measures to prevent the lifeboat from falling, constituted negligence and created an unseaworthy condition. Libellant asserts that the lifeboat should either have been replaced in its cradle or secured by additional lashings before the workmen were permitted to begin working in it. Admittedly, had either of these precautions been taken, no accident would have occurred. The questions presented for our resolution, however, are first, whether it was negligent to fail to take the suggested precautions, and second, whether, without them, there resulted an unseaworthy condition due to which libellant was injured.
 
 
 10
 The preponderance of evidence adduced at the trial fully supports the trial court's determination that the prospect of the falling of a lifeboat under the circumstances presented here did not possess those elements of reasonable foreseeability which would impel the conclusion that reliance upon the Rottmer-type releasing gear constituted a failure to exercise that degree of care which could be expected of a reasonable man. It seems clear, beyond cavil, that the three workmen were familiar with the operation of the releasing mechanism and that they were given ample warning of the danger inherent in moving the handle. Under no theory could a standard be considered reasonable which imposed upon the shipowner a duty to safeguard absolutely against the possibility that the handle would be moved by one of these men. The fact that past experience had proved that it is virtually impossible for the hooks to open unless the lever is moved in the required arc, that the mechanism had passed an inspection only two and one half weeks earlier and had functioned perfectly for more than twenty-four hours preceding the accident negates any inference that the respondents were derelict in not taking additional precautions against the possibility of malfunction of the apparatus.
 
 
 11
 The principal factual issue contested at the trial was whether or not there was a custom or practice to permit work in lifeboats, when in port, only while the boats were in their cradles or when protected from a possible fall by lashings, sometimes described as 'stoppers' or 'preventers,' or by 'mousing' the releasing hooks. Libellant relied on a number of witnesses who testified that lashings were always used, also upon certain excerpts from a Coast Guard publication used in the instruction of those desiring certificates as lifeboatmen or ABs, and further testimony that some of the other lifeboats on this very vessel were lashed when work was done upon them overside in port. It is claimed by appellant that certain evidence was erroneously excluded, and we shall discuss that point later.
 
 
 12
 The difficulty with appellant's position on this crucial question of fact is that respondents produced a number of experts of wide experience who testified in effect that it was true that lashings were often used, but that the practice was confined to occasions when work was being done on the falls or on the releasing machinery and that no lashings were customarily used when jobs like cleaning and painting of the lifeboats were in progress.
 
 
 13
 The trial judge followed all this evidence with scrupulous care and attention and his conclusion that no such custom or practice existed, as was contended for by appellant, was based largely on the credibility of witnesses who testified in open court, and is amply supported by the evidence. What it all boiled down to is the difference between the exercise of reasonable care, on the one hand, as contrasted with the taking of every conceivable precaution or adherence to the highest standard of care, on the other.
 
 
 14
 We now turn to libellant's assertion that the failure to use these extra precautions constituted unseaworthiness. If he prevails in this contention, it is undeniable that it is unnecessary to inquire into whether the unseaworthy condition came about as a result of the fault or neglect of respondents. Alaska S.S. Co., Inc., v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Pope & Talbot, Inc., v. Hawn, supra; Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. Although the doctrine of seaworthiness which is said to impose a warranty on the shipowner that the ship, its equipment and appliances are not defective has, in recent years, been extended to include within the scope of the warranty such things as appliances brought on board by an independent contractor to be used by him in repairs aboard ship, Alaska S.S. Co., Inc., v. Petterson, supra, and the adequacy and competency of its crew, Overseas Tankship Corp. v. Keen, 2 Cir., 1952, 194 F.2d 515, certiorari denied 1952, 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363, it has never been held to require the best possible equipment or to impose an insurer's liability for any and all injury to those working on shipboard, Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397; see Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834. As this Court held very recently, 'It requires only that equipment be reasonably fit for the use for which it was intended * * *.' Berti v. Compagnie De Navigation Cyprien Fabre, supra (213 F.2d 400). In every case in which recovery for unseaworthiness has been allowed, the trial court or the appellate court, in the exercise of its special admiralty power, found that either the ship or its appliances or equipment was not thus fit.[1]
 
 
 15
 In the case before us, the testimony presented to the trial court clearly provided a predicate from which it could be and was quite reasonably inferred that a Rottmer-type releasing gear in proper condition furnished ample protection against the falling of a lifeboat and that the gear here in question was not defective or inadequate. The imposition of a requirement that a lifeboat be rigged to take care of exigencies as remote and unlikely as that which arose in this case would extend the scope of the warranty of seaworthiness far beyond the limits set by the criterion of reasonable fitness. Under these circumstances, the trial court's finding of seaworthiness seems to us to be unassailable.
 
 
 16
 Only one further issue raised by this appeal remains for our consideration. In attempting to establish negligence and unseaworthiness resulting from the failure to take extra precautionary measures, libellant sought to secure the production and admission into evidence of prior contracts between the respondents and various others, in which, it was claimed, specific provision had been made for the employment of lashings where lifeboats were suspended outboard during painting and cleaning or analogous work. In addition, libellant offered certain excerpts from the Coast Guard publication referred to earlier, which unlike the excerpts that had previously been admitted, appeared under the heading of 'Suggestions for Seamen' and to the admission of which, again unlike the case of the earlier excerpts, the respondents objected. The trial judge refused to require the production of or to admit the contracts on the ground that they would not have sufficient probative value unless libellant could prove that the provisions referred to had actually been complied with. He also appears not to have admitted the later excerpts, concerning which there was extended colloquy at the trial. The substance of the earlier and later excerpts was substantially the same, although the later ones contained statements about the 'preventers' and 'mousing' which were more specific and more clearly formulated. But the so-called 'Manual' did not purport to nor did it contain authoritative requirements or regulations. Its contents were not nor were they required to be published in the Federal Register, and it seems to have been no more than a quiz book for those taking the examinations for certificates as lifeboatmen or as ABs. The excerpts which were admitted were contained in the part of the 'Manual' addressed to those desiring to take the examination for certification as lifeboatmen and the excluded excerpts in the part entitled 'Suggestions for Seamen.'
 
 
 17
 In view of the liberality which generally prevails in trials before an admiralty judge, sitting without a jury, these items of proof might well have been received, but their probative value in the light of the record as a whole would have been negligible. We cannot say that the rulings as made materially prejudiced libellant's rights or that they justify a reversal of the decree, as it is clear that the trial judge would have arrived at the same conclusion in any event.
 
 
 18
 Affirmed.
 
 
 19
 CLARK, Chief Judge (dissenting).
 
 
 20
 Judge Medina's careful and reasoned opinion is supportable on views of the meaning of unseaworthiness announced by this court in several cases a few years back; but they seem to me incompatible with the principle as now defined by the Supreme Court, and they were actually disapproved in Petterson v. Alaska S.S. Co., 9 Cir., 205 F.2d 478, which is affirmed, on the ground taken below, in Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. So I feel this case requires a re-examination of our earlier view.
 
 
 21
 Since libellant has conclusively shown that the rigging of the lifeboat was at least a concurrent cause of the accident, it seems to me irrefutable that he can recover on the theory of unseaworthiness. The district court's finding, from conflicting evidence, that there was not necessarily a custom to rig or cradle lifeboats being painted goes at best to the issue of negligence, but does not affect the shipowner's absolute responsibility to provide a safe place to work. See Petterson v. Alaska S.S. Co., supra; Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; McCarty v. United States, D.C.E.D.N.Y., 88 F.Supp. 251, affirmed per curiam 2 Cir., 196 F.2d 221.
 
 
 22
 This result would seem to follow even if we accept the district court's inference that 'someone' must have tampered with the releasing mechanism. Contributory negligence at best is a matter of defense, which must be proved, as it certainly was not here. In fact, the district court's result can be approved only by implicit recourse to the now discredited fellow-servant doctrine. For the facts relating to the relative experience and to the position in the boat of the three workmen point to the culpability of Rosa, rather than of either of the others. Thus it is being assumed that liability is absent if Rosa pulled the lever. The fellow-servant doctrine was explicitly eliminated by the Jones Act, 46 U.S.C., for negligence cases, and was never a defense to unseaworthiness. Mahnich v. Southern S.S Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. Its revival here is in direct contradiction to the recent pronouncements of the Supreme Court cited above.
 
 
 23
 Since my view on this basic issue is not to prevail, it hardly is worth while to go into the question of the respective liability of the United States or the Project Construction Corporation.
 
 
 
 [1]
 E.g., In Petterson v. Alaska S.S. Co., Inc., 9 Cir., 1953, 205 F.2d 478, affirmed 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, the Court of Appeals for the Ninth Circuit found that the block, the breaking of which caused libellant's injury, was defective; in Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800, affirmed 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, the Court of Appeals for the Third Circuit pointed out that the absence of hatch covers in the 'tween deck of the ship constituted an unseaworthy condition; in Rogers v. United States Lines, 3 Cir., 1953, 205 F.2d 57, reversed 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, the sole question related to the shipowner's liability for the unseaworthy condition of a land fall runner brought aboard by a contractor, and the fact that it was defective was not questioned