William MORRELL and Evaristo Valle,
Libelants,

v.

UNITED STATES OF AMERICA et al.,
Respondents,
and
Triple "A" Machine Shop, Inc.,
Respondent-Impleaded.

No. 26834.

United States District Court
N. D. California, S. D.

Sept. 16, 1960.

Jay A. Darwin, Kenneth W. Rosenthal, Rex Shoop, San Francisco, Cal., for libelants.

Laurence E. Dayton, U. S. Atty., Keith R. Ferguson, Special Asst. to Atty. Gen., Graydon S. Staring, Atty., Admiralty & Shipping Section, San Francisco, Cal., for the United States.

Bronson, Bronson & McKinnon, John H. Painter, Partridge, O'Connell & Whitney Robert G. Partridge, San Francisco, Cal., for respondent-impleaded.

OLIVER J. CARTER, District Judge.

Libelants seek to recover damages from respondent for injuries received when lifeboat No. 2 of the U.S.N.S. David C. Shanks fell from its davits on April 14, 1953, and struck the dock. At that time libelants were employees of impleaded respondent Triple "A" Machine Shop, Inc., and were in the lifeboat when it fell. The vessel was a United States

Navy civil service manned, dependent passenger transport, operated by the Navy's Military Sea Transportation Service, and it was delivered to the custody of the Triple "A" Machine Shop, Inc. at that company's shipyard in San Francisco, California, on March 31, 1953, for voyage repairs and annual inspection, which repairs were to be made by Triple "A" Machine Shop, Inc. under written contract. Under the contract the contractor was to "furnish all necessary material, labor, services, equipment, supplies, power, accessories, facilities as would be necessary for accomplishing the work specified in the job order," and it was "understood that such personnel (civilian and military personnel attached to the vessel) will not interfere with the work or the contractor's workmen," and, further, that "Unless otherwise specifically provided in the job order, all operational practices of the contractor and all workmanship and material, equipment and articles used in the performance of work hereunder shall be in accordance with the rules of the American Bureau of Shipping, the requirements of the U. S. Coast Guard, the rules of the American Institute of Electrical Engineers, and the best commercial marine practices. Standards other than the foregoing shall be specifically set forth in the job order." As to the lifeboats the parties have stipulated that no other standards were set forth in the specifications. There were a number of specifications requiring certain work to be done as required by Coast Guard regulation, or prepared for Coast Guard inspection. A part of the work to be done by the contractor was to remove eight lifeboats from the ship and replace them with and install a like number of reconditioned lifeboats, including lifeboat No. 2, and to properly provision the new lifeboats. The contract required an obligation of the contractor that "while all work is being accomplished in boats the releasing gear and the boats shall be secured by wire straps to prevent accidental dropping or releasing of the boat during repairs."

At 8:00 o'clock a. m. on the morning of the accident libelants were assigned to load provisions into the lifeboat and the boat had been lowered previously by the contractor's employees so that it was hanging by its "falls" over the side of the vessel. The libelants had been loading provisions into the boat for about ten minutes before it fell with libelants and a painter, who entered the boat to paint the Rottmer release gear lever or handle in the boat. At the time the boat was equipped with "spanners" and life lines, or man lines, which were installed and available for use, but not in use. The boat was not secured by wire straps known as "stoppers" or "preventers", although they were available, having been used the day before during tests on the boat, and having been removed sometime before the accident. The evidence is conflicting as to who removed, or how the wire strap "preventers" were removed, and the Court finds that the inference established by the weight of the evidence is that they were removed by employees of the contractor.

The boat was equipped with a Rottmer safety release gear which was designed to hold the boat in the position and condition in which the boat was at the time of use by libelants and the painter. Examination and testing on the day before the accident, and immediately after the accident, showed the Rottmer safety release gear was in good working order and operating properly. After the fall the lever of the Rottmer gear was found in an open or release position. The undisputed evidence shows that the painter entered the boat to paint the handle or lever of the release gear red, and after the fall only the top of the lever in a closed position was painted, and the underneath side in that position was unpainted. The evidence is contested as to what happened, if anything, to the release gear lever while the painter was in the boat. Since the fall occurred shortly after the painter entered the boat with the lever of the safety release gear in a "closed" or "hold" position before the fall, and was found in an "open" or

"release" position after the fall, and with the painting of the release lever having been partially completed as indicated, the weight of the evidence preponderates in favor of the inference that the painter tripped or opened the safety release gear, causing the boat to fall, and the Court so finds.

The Court found at the conclusion of the evidence that all of the gear of the vessel with respect to lifeboat No. 2 was in good working order, and fit for the purpose intended, and that the accident occurred because of some human failure, and not from any failure of the gear of the vessel. The Court further finds that the customary safety devices for lifeboats, such as a safety release gear, "spanners", "life" or "man" ropes, and "preventers" or "stoppers" were present, in use, or available for use at the time libelants used the boat.

At the time of the accident on April 14, 1953, the work on the vessel by the contractor was near completion, and the officers and crew were aboard the vessel, although she was still in custody of the contractor for the purpose of making the repairs and doing other work under the contract. The contract was to be completed on the following day, but was not finally completed until April 21, 1953. The Third Officer of the ship had been informed that the lifeboat was to be re-provisioned that morning, but neither he nor any of the ship's officers or crew were present when the boat fell, or immediately prior thereto. In this respect the Court finds the Third Officer, Lee, to be a credible and reliable witness.

Under this factual situation libelants claim that respondent is liable for breach of warranty of seaworthiness and for negligence in failing to supply a reasonably safe place in which to work, and in failing to have a ship's officer present to supervise the provisioning of the lifeboat so that the proper safety appliances would have been used by libelants and their fellow servants. Claims under the Jones Act, 46 U.S.C.A. § 688, and the Federal Tort Claims Act, 28 U.S.C. § 1346(b), have been abandoned and libel-ants proceed under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and the Public Vessels Act, 46 U.S.C.A. § 781 et seq.

The findings of the Court that there was no failure of equipment or gear, and that all the safety appliances or gear necessary for the safe conduct of libel-ants' work were either in use or available for use, dispose of the claim of unseaworthiness. The vessel was seaworthy in that all of her appliances and gear were reasonably fit for the purposes for which they were being used. In this respect the case of Manhat v. United States, 2 Cir., 1955, 220 F.2d 143, is apposite. There, in an almost identical situation, the court held that a vessel with a lifeboat equipped with a properly functioning Rottmer release gear was seaworthy. The court said:

> "As the apparatus was in proper working order and free from any defects by way of design or otherwise and the precipitation of the lifeboat to the pier was caused by the carelessness of one of the painters, the trial court was compelled to find as it did that the machinery was in all respects properly constructed and maintained and that nothing about the apparatus itself justified an inference of unseaworthiness; and none of the authorities cited holds anything to the contrary." (220 F.2d 146.)

See also: Freitas v. Pac. Atlantic Steamship Co., 9 Cir., 1955, 218 F.2d 562; Fireman's Fund Indem. Co. v. United States, 5 Cir., 1954, 211 F.2d 773.

The Manhat case also answers the contention that the lifeboat should have been rigged with "preventers" or "stoppers" by saying:

> "In the case before us, the testimony presented to the trial court clearly provided a predicate from which it could be and was quite reasonably inferred that a Rottmer-type releasing gear in proper condition furnished ample protection against the falling of a lifeboat and that

the gear here in question was not defective or inadequate. The imposition of a requirement that a lifeboat be rigged to take care of exigencies as remote and unlikely as that which arose in this case would extend the scope of the warranty of seaworthiness far beyond the limits set by the criterion of reasonable fitness. Under these circumstances, the trial court's finding of seaworthiness seems to us to be unassailable." 220 F.2d 148.

Here the conclusion of seaworthiness is more compelling because the additional safety equipment was available, and had in fact been removed from the lifeboat by the contractor's employees prior to putting the boat in the position from which it fell. In any event the cause of the fall has been found to be the tripping or opening of the Rottmer release gear (a perfectly seaworthy appliance) by a fellow servant.

■ Respondent contends that the libelants, as shoreside repairmen, are not entitled to the warranty of seaworthiness. Under the facts of this case this contention presents a nice question. The vessel was under contract for repairs and annual inspection. The purpose of the contract was to make the vessel seaworthy, particularly as to the lifeboat in question. However, the vessel was not laid up for a major overhauling, nor was she being readied for maritime service after having been deactivated in a "moth-ball" fleet. This situation is more akin to Lawlor v. Socony-Vacuum Oil Co., 2 Cir., 1960, 275 F.2d 599, certiorari denied 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728, than it is to West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161; Latus v. United States, 2 Cir., 1960, 277 F.2d 264, certiorari denied 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55; Huber v. United States, D.C.N.D.Cal.1959, 177 F.Supp. 617. The distinction made in the Lawlor case (supra) appears to be valid here. The court said:

"We have concluded that the character of the work to be done by the shipyard, the presence or absence of a crew performing the customary work of seamen on shipboard, and the consequent measure of control or lack of control by the shipyard over the vessel as a whole, are the determining factors that rule the decision of this case. Doubtless cases will arise in which the question of fact relative to the degree of control exercised respectively by the shipowner and the shipyard may be difficult of resolution. But here we have no conversion of a prisoner of war transport into a passenger carrier for the families of overseas service men (Lyon v. United States, 2 Cir., 1959, 265 F.2d 219), nor extensive repairs amounting virtually to the reconstruction and rebuilding of the vessel (Berge, supra [Berge v. National Bulk Carriers Corp., 2 Cir., 251 F.2d 717]), nor a wholly deactivated vessel from the 'moth ball fleet' (West, supra), nothing in the category of major repairs or structural and extensive changes in the vessel, but only a large number of relatively small miscellaneous items such as are generally included in an annual overhaul. While Bethlehem controlled the particular area where the scaffolds and ladders were put up and where the work of locating and repairing the leaks in the tank bulkheads was being performed, the shipowner had general control of the vessel and a full crew of officers and men were aboard. Under these circumstances we hold there was a warranty of seaworthiness by the shipowner running in favor of the crew and also in favor of shore-based workers on the vessel performing work customarily done by seamen." 275 F.2d 604.

■ On the claim of negligence Manhat (supra) also appears to be controlling. The injury here was not the result of a negligent act of the ship, but of the negligent act of a fellow employee. The ship supplied a safe place in which to work by supplying all necessary safe-

ty gear and appliances in good working order. The work was under the control of the contractor. Nothing the ship did, nor anything that the ship did not do contributed to the accident.

For the foregoing reasons judgment is awarded respondent. Counsel for respondent are directed to prepare and present findings, conclusions and a decree in accordance herewith.