## MOLLICA v. COMPANIA SUD–AMERICANA DE VAPORES (CHILEAN LINE).

### No. 111, Docket 22479.

United States Court of Appeals
Second Circuit.

Argued Dec. 4, 1952.

Decided Feb. 2, 1953.

Writ of Certiorari Denied May 25, 1953.

See 73 S.Ct. 952.

Purdy, Lamb & Catoggio, New York City (Vincent A. Catoggio, New York City, of counsel), for defendant-appellant.

Robert Klonsky, New York City, for plaintiff-appellee.

Before SWAN, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The libellant-appellee is a longshoreman who was injured while employed by the Pittston Stevedoring Corporation in carrying out its contract with the appellant, the owner of the S. S. Aconcaqua, to load that

ship as it lay moored at 57th Street, Brooklyn, N. Y. He sued the shipowner, and after a trial by jury, a verdict in his favor was returned on which was entered the judgment from which the shipowner has appealed. The sole basis of the appellee's claim that the ship was liable was its unseaworthiness, allegations of negligence in the libel having been abandoned by the time the case was submitted to the jury. The appellant relies for reversal upon the denial of two motions it made, one for the direction of a verdict and one for judgment notwithstanding the verdict.

The stevedores began loading the No. 4 hold, where the appellee was hurt, on the morning of August 18, 1949. They were stowing heavy cases of automobile parts; and when the day gang quit work at about a quarter past six, one such case was suspended at one end about two or three feet above the bottom of the hold. It remained in that position because it was wedged between other cases on one side and the tunnel shaft on the other, and it was still resting in the cable fall from the ship's boom by which it was being lowered when it became so wedged.

The appellee was one of the night gang of stevedores that began work at seven o'clock in the evening. He went into the hold and, on seeing the wedged case, he set about to drag away the case on which it rested so that the wedged case would fall and rest flat on the bottom of the hold. In so doing, he used a cable from a boom other than the one in whose cable the wedged case still rested, rigged up a drag line through a snatch block attached to the bulkhead, and connected this drag line to dog hooks which he held against the supporting case. The supporting case was to be pulled out of the way by power slowly supplied from the boom, and the appellee intended to hold the dog hooks against the case until, and apparently only until, the slack on the drag line was taken up. He gave the signal for taking the cable up slowly to the hatch boss who was standing on the tunnel, and the hatch boss relayed it to the winchman orally and by hand signals. When the power was applied, the supporting case was dragged out of the

way, and one end of the wedged case, which consequently fell the two or three feet to the bottom of the hold, landed on the appellee's left foot causing the injuries for which he sued. His explanation of the accident was that the case supporting the wedged case was pulled out so quickly that he did not have time to get his foot out of the way, and that this happened because the hold was so poorly lighted that the hand signal for slow movement was not seen by the winchman and he misunderstood the oral one.

█ It was undisputed that it was the duty of the ship to provide adequate lights. There were small ceiling lights in the No. 4 hold, but these were not turned on because of danger that they would cause the explosion of nitrate fumes, which remained in the hold from a cargo which had been recently discharged. On the ship's mast there were two illuminated adjustable flood lights of 500 watts each; but, although they were beamed on the No. 4 hold, they were at such an angle that they did not supply adequate light for all parts of it. It was customary to supply additional light for a hold in which cargo was being stowed by cluster lamps, of which the ship had twenty-five on board. These consisted of five or six hundred watt bulbs and a reflector with an extension cord which was plugged into a source for the supply of current, called a resistor house, on the deck. It was the duty of the ship's lampman, in whose custody the cluster lamps were kept, to plug the extension cords into the resistor house and place the lamps on deck so that they would be available for use by the stevedores as and where needed. Although there was conflicting evidence on the subject, the jury could justifiably have found from the testimony that the lampman had not made cluster lamps available for use by the stevedores and that the absence of such a lamp or lamps in the No. 4 hold at the time of the accident so impaired the vision of the winchman that it was a contributory cause of the injury.

█ Since Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.

Ed. 1099, the duty of a shipowner to provide an initially seaworthy ship for stevedores to load cannot be questioned. But the duty is a concomitant of control, and the shipowner is not liable for unseaworthiness which arises after control of the ship, or that part which includes the unseaworthy condition, has been surrendered to the stevedores. Grasso v. Lorentzen, 2 Cir., 149 F.2d 127, certiorari denied 326 U.S. 743, 66 S.Ct. 57, 90 L.Ed. 444; Lynch v. U. S., 2 Cir., 163 F.2d 97.

█■ It cannot be gainsaid that a ship is unseaworthy for loading if, and when, adequate lights to make the work reasonably safe are lacking in the part of the ship being loaded. Whether such lights were lacking when these stevedores took over the control of the No. 4 hatch as to make the ship unseaworthy in this respect was a question of fact for the jury. Mahnich v. Southern S. S. Co., 321 U.S. 96, 98, 64 S.Ct. 455, 88 L.Ed. 561. It is claimed not that any lack of lights while the day shift was at work made an unseaworthy condition but that such lack did do that at seven o'clock in the afternoon when the appellee began to work with the night shift; and the evidence was sufficient to permit the jury so to find.

Thus, the theory on which the case was tried posed as the critical issue whether the shipowner, after relinquishing control of the hold to the day shift at eight o'clock in the morning, resumed control between six or six-fifteen when the day shift quit work and seven when the night shift began. The charge in this respect was as follows:

"If you reach the conclusion that the stevedoring company retained control of the No. 4 hold between 6:15, when one crew quit, and 7:00, when another crew started work, then that is the end of the case and you will return a verdict for the defendant. For it is not contended that a dangerous or unseaworthy condition existed when the stevedores first came aboard the ship in the morning, and if the ship was in a seaworthy condition when the stevedores first came aboard, and they retained continuous control, any dangerous condition subsequently created is not the responsibility of the ship and the shipowner could not be held to account in this lawsuit."

█ As the jury must have found that the shipowner did resume control of No. 4 hatch during the period between shifts, the result of this appeal depends upon whether there was evidence sufficient for the jury to find facts which as a matter of law put control of the hatch in the shipowner during the critical period. Otherwise the motion for a directed verdict should have been granted.

While it is true that the loading was to be by day and night until the hold was stowed, the testimony of the ship's third mate enabled the jury to find that it was his duty to make sure that the cargo was being properly stowed and that he inspected No. 4 hold between shifts while the stevedores were away. The jury could also have found that he knew more illumination would be needed when the night shift of stevedores began work and that it could be obtained only by having the ship's lampman put out cluster lamps and plug them into the resistor house so that the stevedores could put the lights where needed. The stevedores had left the hold open with none of their men in charge and we think the evidence supports an inference by the jury that the mate assumed control of the hold when he made the inspection. See Guerrini v. U. S., 2 Cir., 167 F.2d 352. Thus the verdict was supportable on the basis of the unseaworthiness of No. 4 hold because of lack of lighting when the stevedores took control of it from the shipowner at seven o'clock.

█ The allowance of the amendment of the libel to permit the appellee to abandon negligence as the legal basis of recovery and put his reliance upon seaworthiness alone was no abuse of discretion. Even the need for such an amendment is doubtful for no additional issues of fact were raised thereby.

Judgment affirmed.

SWAN, Chief Judge (dissenting).

The opinion states that the issue posed by the appeal is "whether there was evidence sufficient for the jury to find facts which as a matter of law put control of the hatch in the shipowner during the critical period." I agree that this is the issue, but I am unable to agree with my brothers' conclusion that it was permissible for the jury to find "that the mate assumed control of the hold when he made the inspection." Judge Edelstein's opinion, 107 F.Supp. 316, at 317 notes that "the third mate testified that he was responsible for the safe stowage of the cargo. He further gave testimony from which the jury could have found that he made an inspection of the hold during the disputed period." The trial judge evidently thought, and my brothers appear to be of the same opinion, that this testimony would justify a finding that the mate's inspection constituted a resumption by the shipowner of control of the No. 4 hold. I think this involves a misconception of the testimony. The mate's responsibility for the stowage of cargo was to see that *stowed* cargo had been properly stowed for the safety of the voyage. This is all his testimony means, as I read it.[1] Concededly the ship had surrendered control of the hold to the stevedores when they started loading in the morning. An inspection by an officer of the ship later in the day and before their work has been completed to see that the work was being properly done and that so much of the cargo as had been finally put in place had been safely stowed, cannot as a matter of law, in my opinion, sustain a finding that thereby the ship resumed control of the hold. Unless control was thus resumed, the majority opinion, as I read

it, would not find the judgment supportable because of lack of lighting. I think the motion for judgment notwithstanding the verdict should have been granted.

[1.] What he said was as follows:
"Q. Between 5 and 6, on the day of the accident, which was two hours, or one hour, before this gang came down to work, you were down in the lower hold? A. Between 5 and 7 o'clock.
"Q. You were down there? A. At that time I take a look at all the hatches. I go one by one to see the proper conditions of the stowage of the cargo.
"Q. In other words, you felt that you

were responsible to see that it was in proper condition? A. Yes, I am the officer on duty.
"Q. You were responsible? A. Yes, sir. I received orders from the Chief Mate on the stowage, and he tell me, 'I want the cargo in this condition in the hatch, here, here, and here.' All the places they want to put the cargo. The lower part of the hatch was completely full of cargo."