**August DI SALVO, Plaintiff,**

v.

**CUNARD STEAMSHIP CO., Ltd.,
Defendant.**

United States District Court
S. D. New York.

Feb. 17, 1959.

**814**

Sylvia Miller, New York City, for plaintiff. Chester A. Hahn, New York City, of counsel.

Richards W. Hannah, New York City, for defendant. Lord, Day & Lord, William J. Brennan and John Quinlan, New York City, of counsel.

HERLANDS, District Judge.

### Defendant's Motion

The scope of the doctrine of unseaworthiness is the problem squarely posed by the defendant's motion to set aside the jury's verdict. For purposes of the present motion, the Court must resolve all conflicts in the evidence in plaintiff's favor and view the evidence in a light most favorable to plaintiff.

In this personal injuries action brought on the civil side of the court, the plaintiff, a stevedore, is suing Cunard Steamship Co. Ltd., the owner and operator of the Scythia. The complaint, asserting claims of the defendant's negligence and the unseaworthiness of the defendant's vessel, is framed under the general, non-statutory maritime law.

The accident occurred on the morning of March 28, 1957 at Pier 92, North River, Manhattan. Plaintiff was a longshoreman employed by John T. Clark & Son Company, contracting stevedores. He had the job title of foreman-rigger. John T. Clark & Son Company was under contract with defendant to render services, including the putting out or rigging of a passenger baggage chute from the north side of the dock to the Scythia. Plaintiff was in charge of rigging the particular passenger baggage chute involved in this case.

Pier 92 and the dock building on it were leased from the City of New York by the defendant Cunard Steamship Co. Ltd. The pier was used exclusively by Cunard ships. For the convenience and use of the defendant's ships when docked at the pier, there was kept on the dock a piece of equipment known as a passenger baggage chute.

The Scythia was a combination cargo and passenger ship. While the Scythia was at the pier and for the purpose of overseeing the servicing of the ship, the ship was represented by Captain Gill and his assistant, Chris Robbins. Captain Gill's orders to plaintiff are critically involved in this case. There is no dispute as to the authority of Captain Gill or Robbins to act in behalf of defendant.

On Pier 92 was a two-story dock building. The Scythia was "spotted" or located alongside the pier, parallel to it, with its bow toward the land and its stern toward the river. There was a marker on the span of the dock building, indicating where the vessel should stop and tie up.

The lower or first floor of the dock building is on the street level. The upper or second story is called the "loft." At the lower level of the dock there was a stringpiece that was six feet wide. Between the stringpiece and the vessel was a ten-foot float or platform. Thus, the vessel was approximately sixteen feet from the dock building.

On the side of the dock building, facing the vessel, were regularly spaced doors, separated from each other by columns. The doors were numbered. We are concerned particularly with doors 35 and 36 on the loft. These doors were about twenty feet wide. The column between them was about two feet wide.

The Scythia carried six hundred to eight hundred passengers. Baggage to be kept in the passenger staterooms was to be loaded on the Scythia from the sec-

ond story or loft of the dock building onto Deck A of the ship, where it could be picked up by crew members or stewards for delivery and distribution to the staterooms of the passengers.

In transferring passengers' baggage from the dock to the vessel, a chute was used. It normally issued out of door 35 on the loft of the building, its inboard end being positioned on the loft floor and its outboard end being positioned on the vessel through an open bulwark door on Deck A. This bulwark door, when closed, formed part of the ship's rail. Baggage slides down the chute from the loft onto the ship by force of gravity.

The chute in question was kept on the dock when no ship was at the pier. The chute was used almost exclusively for the defendant's ships when they are berthed at Pier 92. The physical dimensions, construction, wheels, stanchions and lashings of the chute were minutely testified to. It was approximately thirty feet long and weighed several hundred pounds.

The Scythia was berthed at Pier 92 on March 26, 1957, and remained there on March 27 and March 28, 1957. It was scheduled to sail on the afternoon of March 28, 1957.

Normally, the baggage chute issued from door 35 of the loft at almost right angles on the horizontal plane to both the dock building and the ship, the ship lying parallel to the building. In this way, the chute normally would be almost perpendicular to the building and the ship, issuing out of door 35 straight into the bulwark door on Deck A of the ship. The ship normally tied up at a spot that placed the bulwark door on Deck A directly opposite door 35 of the loft of the dock building. On the vertical plane the chute would incline downward from the level of the dock loft at door 35 to the bulwark door on Deck A.

On the day of the accident, Captain Gill ordered plaintiff to rig the chute out from pier door 36 (instead of door 35) to the bulwark door on Deck A. Over plaintiff's protests, Captain Gill insisted that the chute issue out of door 36. As the ship was scheduled to sail that afternoon, certain cargo loading involving hatch number 6 had to be carried on at the same time as the passenger baggage was being loaded via the chute; and Captain Gill ordered the particular positioning of the chute to achieve the concurrent operations.

According to the plaintiff's proofs, the issuance of the chute out of door 36, instead of door 35, necessarily involved putting out the chute at a sharp angle, as distinguished from the normal right angle. In addition, the Deck A of the vessel was considerably below the level of the loft of the dock building. Consequently, plaintiff's compliance with Captain Gill's order meant putting out the chute at sharp angles horizontally and vertically; hence plaintiff's protests, which were overruled.

Upon the trial, detailed testimony was given on the following subjects, among others: how the ship was positioned relative to the pier, and its distance from the pier; how the opening in the bulwark on Deck A was positioned relative to the pier doors 35 and 36; how far the bulwark door on Deck A was below the level of the dock loft; the relative location of hatch number 6 with respect to the pier doors; the angles, horizontally (that is, right or left) and vertically (that is, up and down) at which the chute was issued out of door 36 toward the bulwark door on Deck A; customary and usual practices, principles, procedures and methods with respect to putting out baggage chutes; the angles at which chutes were put out; the details of handling such chutes and alleged safety practices, including matters of keeping control of the chute; how the plaintiff actually operated or manipulated the chute; the state of the tide at the time of the accident; the nature of the danger to the plaintiff in putting out the chute.

The Court charged the jury that, for purposes of this case, the baggage chute was to be deemed "ship's equipment" and that plaintiff was to be treated as a "seaman," as follows:

"For purposes of your consideration of the evidence in this case, I charge you that the baggage chute must be deemed to be, as a matter of law, a part of the ship's equipment, and that the chute must be so deemed notwithstanding the fact that one of the witnesses referred to it as 'dock equipment.' Passenger baggage chutes, like gangways, escalators and accommodation ladders, are traditionally and functionally part of a passenger ship's gear, because such appliances afford immediate means of egress and ingress from and to the ship; are essential for loading and unloading the ship and the carrying of the ship's passengers.

"I also charge you that, although the plaintiff was a longshoreman, performing work as a foreman-rigger, as a matter of law he was rendering an essential and maritime service to the defendant's vessel, in rigging up the chute, as it was a passenger vessel, carrying 600 to 800 passengers. Thus, the plaintiff as a matter of law was performing work traditionally done by seaman or crew members. Moreover, the order originated with Captain Gill, who represented the defendant and was a person with authority to represent the defendant.

"In view of the facts that I have referred to, that the baggage chute must be considered as part of the ship's equipment; that the plaintiff must be considered as a matter of law as in the status of a crew member, maritime or admiralty law—the words "maritime" or "admiralty" are synonymous; they mean the same thing—maritime or admiralty law applies to this case, as I shall and now do charge you; and the plaintiff, for purposes of this case, is deemed to be a seaman within the meaning of the law. As such, the plaintiff is entitled to all the legal protection normally extended to sea-

men who are actually members of the crew of a vessel.

"Now, the accident, it is undisputed, took place while the plaintiff was standing on the second floor or loft of the dock building, and the dock building is part of the land. So, ordinarily, you would say or think that land law applies, because he wasn't on the ship. But the legal principles applicable to this case as such, as I have said to you, that maritime or admiralty law, as I shall explain to you, applies to this case."

On the subject of "unseaworthiness," the Court charged the jury as follows:

"I have explained to you the theory of negligence, and I had to refer to unseaworthiness, incidentally. But now I come to the definition of what is unseaworthiness, and it is an entirely different concept from the concept of negligence, because negligence deals with what a reasonably prudent man would do under the same or similar circumstances. It deals with the question of foreseeable results.

"The doctrine of unseaworthiness is a doctrine that originated out of marine, maritime, admiralty law. The principle or doctrine of seaworthiness is that the owner of a vessel is required to operate and maintain the vessel and its equipment, appliances and appurtenances in such a manner that the vessel and its equipment, appliances and appurtenances are reasonably fit and suitable for the purposes for which they were intended to be used. This imposes upon the shipowner a sort of liability without fault, in the sense that the shipowner must supply a seaworthy vessel, with seaworthy equipment, appliances and appurtenances, and that if the shipowner fails to do so, it is no excuse or defense for the shipowner that the shipowner did not have any knowledge of the unseaworthy con-

dition, and it is no excuse even if the defendant, with the exercise of ordinary care, could not have discovered such unseaworthy condition.

"While the shipowner is not required to furnish equipment, appliances and appurtenances that are the very latest in design or ideal, the shipowner is accountable, regardless of his knowledge or lack of knowledge, or the reasonableness thereof, if in fact he fails to supply equipment, appliances or appurtenances that are reasonably suitable for the purposes for which they are intended to be used.

"The doctrine of unseaworthiness also applies to a situation where otherwise seaworthy equipment is caused to be used by the defendant in such a manner as to create a condition of unsuitability of the equipment for the purposes intended, and in such a case a condition of unseaworthiness is created by the improper use of equipment that would otherwise be seaworthy.

"If, as a result of plaintiff's complying with defendant's orders that the chute be put out of pier door 36 and be positioned in the bulwark door on the ship's Deck A, a condition was created whereby plaintiff was placed in likely danger of being injured by the chute, then if you find each of said facts you will conclude that the vessel was rendered unseaworthy to the extent of that condition.

"Under the circumstances of this case, and as a matter of law, as I have already charged you, the chute must be regarded by you as a part of the ship's equipment. Both sides agree that the chute, considered by and of itself, was sound and suitably constructed for its purposes, and was seaworthy. Both sides agree that the vessel, considered by and of itself, was sound and suitably constructed and maintained for its purposes and was seaworthy. But notwithstanding the immediately re-ferred to facts as to which the parties agree, if you find that the baggage chute was manipulated by plaintiff, acting on defendant's orders, in a manner that was reasonably necessary in order for plaintiff to comply with defendant's directive; and if by virtue of such manipulation, the chute's position and possible movements created a condition of danger to plaintiff, then you should conclude that the chute was in a condition of unseaworthiness.

"As indicated, under the doctrine of unseaworthiness, it is not necessary for plaintiff to prove that the defendant had knowledge of the alleged danger to which plaintiff was exposed.

"You will notice the important differences between the theory of unseaworthiness and the theory of negligence. Because negligence requires the exercise of reasonable care; it involves the element of foreseeability, whereas under the doctrine of unseaworthiness, that does not apply.

"To repeat somewhat: The defendant had the duty to furnish the plaintiff with a seaworthy vessel, equipped with seaworthy appliances and appurtenances, and the question is whether or not, under the circumstances of this case and in accordance with the charge which I have given to you, an unseaworthy condition was created at or about the time the accident took place.

"Now, the liability on the part of the shipowner which arises from the failure to furnish a vessel and equipment that is in all respects seaworthy, as I have already stated, does not depend in any way upon knowledge of the shipowner of any defect. The terms "seaworthiness" and "unseaworthiness" do not merely refer to the staunchness of the vessel and its tackle and its ability to navigate and withstand rough weather, as may be commonly believed. But under the law the own-

er of the vessel is required to furnish a vessel, tackle, gear and appliances which are in all respects reasonably adequate for the purposes intended. Even if the owner of the vessel has furnished a vessel which is in all respects reasonably adequate for the purposes intended at the time when the vessel was docked, his duty to the plaintiff does not end there, but he is required at all times to maintain the vessel and its appurtenances in a reasonably safe condition and suitable for the purposes for which they are intended to be used.

"The duty to keep the vessel seaworthy is a continuing one. It is one which may not be delegated, and it is not an obligation which may be discharged by entering into a contract with plaintiff's employer to do the work.

"Plaintiff was discharging, as I have indicated, the duties of a seaman at the time of the happening of the accident. Plaintiff does not assume the risk of the hazards which are implicit in the work to be discharged. If the defendant did not recognize any alleged danger involved in the process of positioning the chute, as allegedly required by plaintiff's compliance with Captain Gill's order, and if the chute was caused to swing solely as a result of the act necessarily performed in the course of positioning the chute, and if you, the jury, should find that a condition of unseaworthiness was thereby created, then and in that event any lack of knowledge on defendant's part as to such danger would not completely exonerate the defendant from liability, under the theory of unseaworthiness."

The following interrogatories were submitted to the jury:

"Interrogatories

"Question 1

"Did any negligence on the part of defendant serve as a cause of the accident?

"Question 2

"Did any unseaworthiness on the part of the vessel serve as a cause of the accident?

"If your answers to both Question 1 and Question 2 are 'No,' then you are not required to consider or answer any of the following questions.

"If your answer to Question 1 or Question 2 is 'Yes,' then you will answer the following questions, Question 3 and Question 4.

"Question 3

"What is the amount which you find to be the plaintiff's damages attributable to the injuries, as the word 'damages' has been defined by the Court in the charge to you?

"Question 4

"Did any act of omission or commission on the part of the plaintiff contribute to his injuries?

"If your answer to Question 4 is 'No,' then you are not required to consider or answer Question 5.

"If your answer to Question 4 is 'Yes,' then you will answer the following question, Question 5.

"Question 5

"What percentage of plaintiff's injuries was attributable to such acts of omission or commission on plaintiff's part?

"In the event that you answer Question 5 by stating a percentage, do not deduct any amount from the figure of damages given in the answer to Question 3. Any deduction based upon the percentage will be made by the Court."

The jury returned the following verdict in the form of answers to the interrogatories:

"Question No. 1—No.
Question No. 2—Yes.
Question No. 3—$18,000.
Question No. 4—Yes.
Question No. 5—51 per cent."

The defendant's motion to set aside the verdict is denied for the reasons set forth in this opinion.

The "recent rapid development of the law in the area of maritime torts" (Palermo v. Luckenbach Steamship Company, 2 Cir., 1957, 246 F.2d 557, 559, reversed 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed. 2d 3) is strikingly illustrated by the expansion of the admiralty concept of "unseaworthiness," a remedy that "is judicially rather than legislatively created." McAllister v. Magnolia Petroleum Co., 1958, 357 U.S. 221, 78 S.Ct. 1201, 1206, 2 L.Ed.2d 1272.

The more recent cases in the area of "unseaworthiness" suggest strongly that the emphasis has shifted from situs to status, from geography to policy. While the cases are suggestive of a "common principle of decision or method of approach to the problem," there is no discernible "simple formula" for reaching the correct conclusion. Cf. Medina, C. J. in Bartholomew v. Universe Tankships, Inc., 2 Cir., 263 F.2d 437, 441.

The doctrine of unseaworthiness has been extended by the Supreme Court to cover certain shore-based workers on the ground that, under certain circumstances, a longshoreman, stevedore or other harborworker may be performing work traditionally done by seamen; and, consequently, if injured, may sue the shipowner. Atlantic Transport Co. of West Virginia v. Imbrovek, 1914, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208; Alaska S. S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Seas Shipping Co., Inc. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. See Gardner, Remedies For Personal Injuries To Seamen, Railroadmen, and Longshoremen (1958) 71 Harv.L.R. 438, 451–453.

Unseaworthiness recovery may be available even where, as here, the injury is not shipboard but occurs when the longshoreman on the pier is engaged in loading or unloading the ship or performing similar services handling the ship's equipment. Strika v. Holland America Line, D.C.S.D.N.Y.1950, 90 F. Supp. 534, affirmed Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F. 2d 555, certiorari denied 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343.[1] See Klimaszewski v. Pacific-Atlantic Steamship Co. Inc., 3 Cir., 1957, 246 F.2d 875.

■ In Seas Shipping Co., Inc. v. Sieracki, supra, the Supreme Court pointed out that liability for unseaworthiness is an incident of the essential maritime or ship's services rendered with the shipowner's consent; and has its roots in the risks that that service places upon maritime workers and in the policy of the law to secure their indemnity against such hazards.

In the case at bar, there was "traditional crew work" and "traditional ship's equipment."

■ Plaintiff, although a longshoreman acting as foreman rigger, was rendering services that were: (a) traditionally performed by seamen, i. e., crew members; (b) essential to the ship's operation as a vessel carrying passengers as well as cargo. For the same reasons, plaintiff's status vis-a-vis the vessel was that of a quasi-crew member.

1. Strika has been the subject of much comment. See, e. g., Admiralty—Injury to Longshoreman Working Ashore By Unseaworthiness of the Vessel (1951) 50 Mich.L.R. 141; Admiralty—Torts—Longshoreman Recovers From Shipowner Where Injury Received In Loading From Dock Was Caused By Unseaworthy Gear Of Ship (1951) 64 Harvard L.R. 996; Admiralty—Seaworthiness Doctrine—Extension to Longshoremen on Land (1951) 29 Texas L.R. 367. But see Note; Overlapping Remedies For Injured Harborworkers: Interaction On The Waterfront (1958) 67 Yale L.J. 1205, 1242 note 170.

Such liability does not extend to a situation where, for example, the injury was incurred by a longshoreman standing on a pier, as a result of the failure of a defective skid or platform located on the pier and furnished by the subcontractor-stevedoring company as part of its tools or equipment. Fredericks v. American Export Lines, 2 Cir., 1955, 227 F.2d 450.

The instrumentality or means employed in the performance of plaintiff's work included the passenger baggage chute. In the process of being maneuvered and jockeyed into position, the chute came into contact with the vessel as a necessary preliminary to the chute's becoming firmly affixed to the vessel. One of the front lashings attached to the outboard end of the chute had been wound on a cleat on the ship.

In any event, the passenger baggage chute must be treated as "ship's equipment." It was used only for the purpose of loading the ship with passenger baggage. It was owned by defendant and used only by defendant for servicing its ships at Pier 92.

Two of plaintiff's gang (Murray and Moore) were required to work on the ship and were on the ship attempting to secure the chute to the ship almost at the time of the accident. Plaintiff, though stationed on the pier, was not only an integral part of the gang working on the vessel, but he was the gang foreman.

The orders to plaintiff emanated from defendant's representative, Captain Gill, and were controlling on plaintiff with respect to the pier door (door 36) out of which the chute was to be issued and the place (the bulwark door on Deck A) on the vessel into which the chute was to be positioned.

The defendant's sharpest attack is based on the proposition that the admittedly seaworthy chute could not become unseaworthy or create an unseaworthy condition and that, therefore, the Court's charge (supra, 171 F.Supp. at pages 816–818) on that subject was erroneous.

Light is thrown on the problem before us by a consideration of the development of the doctrine of unseaworthiness in other situations where the ship's equipment, appliances and appurtenances that were otherwise seaworthy were rendered unseaworthy or became part of a condition of unseaworthiness when combined with certain additional elements.

In Poignant v. United States, 2 Cir., 1955, 225 F.2d 595, the libelant, a stewardess, sued in admiralty to recover for injuries sustained when she slipped in one of the ship's passageways. The fall was caused by the presence of an apple peel on the floor of the passageway. The district court had concluded that the evidence did not establish unseaworthiness. The Court of Appeals reversed and remanded the case for a new trial on the issue of unseaworthiness.

In Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213, certiorari denied 1951, 340 U.S. 935, 71 S.Ct. 495, 95 L.Ed. 675, the majority of the Court of Appeals in dealing with jello on the ship's stairway, were of the view (184 F.2d at page 215) "that the doctrine of unseaworthiness does not extend so far as to require the owner to keep appliances which are inherently sound and seaworthy absolutely free at all times from transitory unsafe conditions resulting from their use." Chief Judge Biggs dissented and expressed the following view:

"If the stairway was in a condition dangerous for the use for which it was intended, however, 'transitorily', it was unseaworthy. It remained so while the unsafe condition persisted. The element of time which has intruded itself in this case in both the opinion of this court and that of the court below is irrelevant under the doctrine of the shipowner's absolute liability" (at page 216).

The views expressed above by Chief Judge Biggs were quoted with approval by Judge Frank in Poignant, supra, 225 F.2d at page 603.

In Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, the libelant was a longshoreman who sued for injuries sustained in falling through an open hatch while working on board a vessel owned by respondent. The claim was based upon the theory that the vessel became *pro tanto* unseaworthy when the wrong hatch cover (one without the necessary indentation) was placed over a protuberance called a pad-eye; and that, there-

fore, libelant could recover for the injuries sustained when he stepped upon the hatch cover and it gave way beneath him. The wrong hatch cover had been selected and misplaced by two other members of the longshoremen's gang before the libelant walked over it. The wrong hatch cover had been laid over the pad-eye "only a short time before he [libelant] fell" (at page 922). As Judge Hand viewed the situation, the hatch cover "had become part of the platform across which" the libelant walked to gain access to another section of the vessel; and, in Judge Hand's view (at page 923) "the misplaced cover had therefore become as much a part of the 'tweendeck' for continued prosecution of the work, as though it had been permanently fixed in place."

Judge Hand was concerned with the question whether "the defect" in gear (at page 922) "that arises as a momentary step or phase in the progress of work on board should be considered as an incident in a continuous course of operation, which will fasten liability upon the owner only in case it is negligent or as an unfitness of the ship that makes her *pro tanto* unseaworthy." Judge Hand then distinguished cases (at page 922) where a vessel "is not deemed unseaworthy," as when "a strongback is dislodged by the negligence of a winchman, or of those who direct him (Berti v. Campagnie de Navigation, etc., 2 Cir., 213 F.2d 397; Freitas v. Pacific-Atlantic S.S. Co., 9 Cir. 218 F.2d 562), or when some one of the crew carelessly turns a lever that drops a boat from its davits (Manhat v. United States, 2 Cir., 220 F.2d 143)."

In distinguishing the above-cited cases, Judge Hand expressed the view (232 F.2d 922) that "if the wrong hatch cover had been placed over the 'pad-eye' the day before the libellant stepped on it, this ship would have been unseaworthy; for that was in effect just what we decided in Mollica v. Compania Sud-Americana, 2 Cir., 202 F.2d 25."

In Mollica, supra, Judge Hand explained (232 F.2d 922) the Court "agreed that she was unseaworthy, although she was completely fitted with adequate gear and her only defect was that those responsible for setting it in place [necessary extra lights, plenty of which were on board] had failed to do so."

Judge Hand dealt with the time aspect of the problem and concluded (at page 922) "that enough time had elapsed to result in unseaworthiness," although that time was "only a short time." Referring to this temporal aspect, Judge Hand said (at page 922):

"It would be futile to try to draw any line between situations in which the defect is only an incident in a continuous operation, and those in which some intermediate step is to be taken as making the ship unseaworthy. Nevertheless, it is necessary to separate the two situations, even though each case must turn on its particular circumstances."

Significantly, Judge Swan dissented for the reason, as expressed by him (at page 924), that there is a "distinction between injuries caused by unseaworthy gear and injuries caused by improper use of proper gear." Judge Swan relied upon Berti, supra; Manhat, supra; and Freitas, supra, the three cases that Judge Hand distinguished.

It is evident from the fact that Judge Swan dissented on the precise point just mentioned, that the majority (Judges Hand and Frank) were of the view that the improper use of proper gear may, under certain circumstances, give rise to a condition of unseaworthiness.

It is appropriate, therefore, to consider Berti, Manhat, Freitas, the interpretation of which cases constituted the basis of difference between the majority and minority in Grillea, supra.

In Manhat v. United States, 2 Cir., 1955, 220 F.2d 143, certiorari denied 349 U.S. 966, 75 S.Ct. 900, 99 L.Ed. 1288, the libelant was injured when the lifeboat which he was painting fell. The fall resulted from the moving of a released lever by a fellow-employee. The majority in the Manhat case consisted of

Judges Swan and Medina. Judge Clark dissented.

It appeared that libelant and two fellow-employees were in the lifeboat which they were painting. A releasing gear, operated by a lever, was in the lifeboat. This gear was in proper condition and was seaworthy. In order to operate the releasing gear, a person would have to apply considerable force and move it in an arc, after removing the toggle pin. The three men in the lifeboat had been warned by the foreman not to touch the handle of the releasing gear, which was painted red and above which was a sign bearing the word "Danger." The accident was caused by the fact that one of the men in the boat had released the lever, causing the boat to fall.

Judge Medina, writing for the majority was of the view (220 F.2d 146) that "the precipitation of the lifeboat to the pier was caused by the carelessness of one of the painters" and that "nothing about the apparatus itself justified an inference of unseaworthiness." Judge Medina concluded that the warranty of seaworthiness did not apply to the facts of that case.

It is important to note that Chief Judge Clark dissented, saying (at page 149) that Judge Medina's opinion was "incompatible with the principle [on unseaworthiness] as now defined by the Supreme Court." Judge Clark was of the opinion that the rationale of Judge Medina was "actually disapproved" in Petterson v. Alaska S.S. Co., 9 Cir., 205 F.2d 478, affirmed 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. Judge Clark stated (220 F.2d 149):

"* * * it seems to me irrefutable that he can recover on the theory of unseaworthiness."

Judge Clark took the position that the shipowner had "absolute responsibility to provide a safe place to work" (citing cases). Thus, according to Judge Clark,

a condition of unseaworthiness was created, notwithstanding the fact that the lifeboat and its releasing gear were properly constructed and properly maintained and such condition of unseaworthiness was created because the falling lifeboat constituted a violation of "the shipowner's absolute responsibility to provide a safe place to work."

In Berti, supra, the Court held that the shipowner could not be held liable where it had fully adequate equipment, where the loading operation was being done by an independent contractor who controlled the details of the operation and the injury was caused by negligence in conducting the details of the work.

In Freitas v. Pacific-Atlantic Steamship Company, supra, the question was whether there was evidence of unseaworthiness requiring submission of the issue to a jury. The Court concluded (218 F.2d 564):

"* * * there was nothing other than speculation on which to base a verdict for the plaintiff."

The line of reasoning exemplified in Grillea was adopted by Chief Judge Biggs in his dissent in Crumady v. The Joachim Hendrik Fisser, D.C.D.N.J., 142 F.Supp. 389, reversed 3 Cir., 1957, 249 F.2d 818, certiorari granted 1958, 357 U.S. 903, 78 S.Ct. 1150, 2 L.Ed.2d 1154, reversed 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 413. In this admiralty suit, the libelant-stevedore, who had been employed by a stevedoring concern in unloading the ship, sued the ship and its owners for personal injuries suffered while working on the ship. The district judge ruled that one factor which contributed to the accident was the unseaworthiness of certain equipment of the ship. The structure alleged to have been unseaworthy was a cable or topping-lift which parted, causing a boom which it supported to fall upon the libelant.

The evidence showed that libelant's fellow-stevedores [2] (not the vessel's

---

2. An examination of the United States Supreme Court briefs in Crumady discloses that the main point as between libelant and the shipowner was whether the latter should be held responsible for the acts of the stevedores, libelant's fellow-workers.

crew)—though forbidden to change the position of the head of the boom which the crew of the vessel had placed over the center of the hatch—had changed the attachment of the preventer and guy-head which controlled the position of the boom so that the head of the boom was no longer over any part of the hatch but had been moved a distance to port of the hatch opening. This incorrect procedure imposed an unanticipated and excessive strain upon the topping-lift by distorting the composition of forces present in a normal, straight lifting operation.

The district judge concluded that these acts (by the libelant's fellow-stevedores) "brought into play the unseaworthy condition of the vessel." 249 F. 2d at page 821. The Court of Appeals held that the foregoing conclusion was reversible error. Chief Judge Biggs, dissenting, was of the view that rehearing should be had before the court en banc.

Judge Biggs reasoned that, notwithstanding "a seaworthy boom, topping lift and tackle were employed to lift cargo" (at page 821), the fact that "the boom and topping lift were wrongly positioned by the stevedoring crew" thereby causing too great a strain to be put on the boom and topping lift and causing the topping lift to break, created a condition of unseaworthiness. Citing Grillea and making "a logical and necessary extension of the principles enunciated in Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and in Petterson [Petterson v. Alaska, S.S. Co., 9 Cir., 1953, 205 F.2d 478, affirmed 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798]," Judge Biggs said (249 F.2d 821–822):

> "This is a doctrine to the effect that a 'seaworthy' round peg placed in a 'seaworthy' square hole will render the whole unseaworthy."

The facts in the present case are more strongly in favor of the plaintiff than in Crumady because the positioning of the baggage chute herein was ordered by Captain Gill, the defendant's representative.

In several of the cases just discussed, the added factor that conjoined with the otherwise seaworthy equipment, appliance and appurtenance and created a condition of unseaworthiness was something tangible or physically observable; e. g., the apple peel on the otherwise seaworthy passageway (Poignant); the jello on the otherwise seaworthy stairway (Cookingham); the wrong but seaworthy hatch cover placed on the seaworthy pad-eye (Grillea); and the seaworthy square peg in the seaworthy round hole (Crumady, Judge Biggs' dissent).

In the enumerated examples, the equipment, appliance or appurtenance, considered by itself and as a structural entity—the passageway, the stairway, the hatch cover or the square peg—was seaworthy. But, when combined with an additive—the apple peel, the jello, the pad-eye or the round hole—a condition of unseaworthiness arose. In other words, the same equipment, appliance or appurtenance became a constituent element in a newly created condition of unseaworthiness. In still other words, the *combination*—consisting of the equipment, appliance or appurtenance plus the additive—was factually a new physical arrangement; and it was the new arrangement that was unseaworthy.

So, too, when the additive is not tangible or physically observable but is force or energy applied to the otherwise seaworthy equipment, appliance or appurtenance, the *combination* of the equipment, appliance or appurtenance plus the added force may then become unseaworthy, as in the case at bar.

The basic question reduces itself to a query whether the distinction between a static arrangement (the original structure plus the physical additive) and a dynamic arrangement (the original structure plus energy) should give rise to different legal consequences.

If Captain Gill, the ship's agent, had directed plaintiff to place grease on the underside of the chute to facilitate its movement; and if, as a result of its greasy condition, the chute became un-

manageable and injured plaintiff as it slid, one might fairly conclude that the greased chute was unseaworthy.

In the hypothetical case, an additive— grease—rendered an otherwise seaworthy chute unseaworthy. In the present case, Captain Gill's order to plaintiff to position the chute in a specified manner which, the jury found, necessarily rendered the chute unmanageable and uncontrollable and exposed the plaintiff to the likely danger of being hit by the sliding chute, a contingency that in fact happened.

If the grease in the supposititious case rendered the chute unseaworthy, it is logical to hold by a parity of reasoning that the chute, when positioned in the directed manner, likewise became unseaworthy. Captain Gill's directive was analogous to and had the same effect as the grease. In the hypothetical situation, the unseaworthiness arises when the commanded grease is applied to the otherwise seaworthy chute; in the present case the unseaworthiness arises when the commanded energy (in the form of physical manipulation in the course of positioning) is applied to the otherwise seaworthy chute. The result is the same in both instances.

■ The only difference between the greased chute and the manipulated chute is the difference in the additive, i. e., between grease and manipulation; and that difference is the difference between matter and energy.[3] That difference does not warrant a distinction in legal consequences with respect to the shipowner's liability if, as here, all the other elements for the application of the principle of unseaworthiness exist, such as, the involvement of ship's equipment, the existence of a maritime status and service between plaintiff and defendant, the issuance of the order by a responsible ship's representative, causation and injury.

It would serve no constructive purpose to attempt to encapsulate the rationale of the decision at bar by employing such labels as "operating unseaworthiness" or "non-structural unseaworthiness."

It is important to observe that plaintiff's compliance with Captain Gill's order required the performance of acts whose duration was more than momentary. The entire operation of positioning the chute was, in point of time, episodic rather than transitory. The resulting condition of unseaworthiness, while "short," was long "enough" to meet the standard suggested by Judge Hand in Grillea. See dissenting opinion of Chief Judge Biggs in Crumady v. The Joachim Hendrik Fisser, 3 Cir., 1957, 249 F.2d 818, 822 ("While it does not appear how long a time elapsed between the positioning of the boom and the topping lift and the occurrence of the accident in the case at bar, it is clear that some time necessarily elapsed."); dissenting opinion of Chief Judge Biggs in Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213, 216 ("the period during which the stairway was in an unsafe [condition]" because of the presence of jello was "immaterial" and "irrelevant").

According to Judge Frank, quoting Chief Judge Biggs with approval, the Second Circuit has repudiated the thesis "that the ship's liability for a 'transitory' object depends upon the length of time during which the object was not removed" Poignant v. United States, 225 F.2d 595, 603.

In the case at bar, the operation of handling the chute in accordance with the order of Captain Gill was not a "momentary" step and it measures up to the "short" but "enough time" requirement expressed by Judge Hand in Grillea, su-

---

3. Cf. Paul B. Sears, The Steady State: Physical Law And Moral Choice, The Key Reporter, XXIV, note 2, p. 2 (January 1959):

"But morality today involves a responsible relationship toward the laws of the natural world of which we are inescapably a part. * * * But more than that, we can find in certain concepts of natural science an invaluable guide as we struggle to attain a better order in our own affairs."

pra, 232 F.2d 922. The handling of the chute in executing the order required considerable manipulation, in the course of which not only the plaintiff himself was working, but also two of his gang on the vessel and other workers on the dock, at least one of whom was operating a house fall; another, a winch on the ground floor and a third was operating an electric machine on the second floor. The operation was quite extensive and not momentary or transitory.

The human factor may have as much practical effect in creating unseaworthiness as a mechanical flaw or physical defect. Compare, for example, the rulings of unseaworthiness in cases involving a fellow-seaman with vicious and dangerous propensities. Boudoin v. Lykes Brothers Steamship Co., Inc., 1953, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Jones v. Lykes Bros. Steamship Co., Inc., 2 Cir., 1953, 204 F.2d 815, certiorari denied 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370; Stankiewicz v. United Fruit Steamship Corporation, 2 Cir., 1956, 229 F.2d 580. The history and rationale of that now well-settled rule are discussed by Judge Learned Hand in Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515, 517–518; and in Jones v. Lykes Bros. Steamship Co., Inc., supra, 204 F.2d 816–817.

It is not intimated that the present case comes within the rationale of Boudoin and related decisions. Those decisions simply illustrate the triple point that the courts have applied the doctrine of unseaworthiness realistically and not mechanically; that the the concept of unseaworthiness is fluid and evolving; and that the concept has not been limited to structural unseaworthiness.

It is worthwhile to repeat that in this case the baggage chute was owned and supplied by the defendant-shipowner and was part of the ship's equipment; the order specifically directed the manner in which the baggage chute was to be positioned; and the order emanated from the defendant's representative. These facts would, it seems, obviate even the objections of Mr. Justice Burton's dissent in Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 401, 74 S.Ct. 601, 98 L.Ed. 798.

The defendant quotes and relies upon the following passage from Gilmore and Black, The Law Of Admiralty (1957) at 320:

"The only case which is today clearly outside the scope of the unseaworthiness doctrine is the almost theoretical construct of an injury whose only cause is an order improvidently given by a concededly competent officer on a ship admitted to be in all respects seaworthy."

If applied literally to the facts of this case, the foregoing quotation would constitute an oversimplification of language and fact. The directive of Captain Gill —who ordered the specific positioning of the ship's equipment, the baggage chute —when carried out by plaintiff necessarily created a situation in which the *otherwise* seaworthy equipment became unseaworthy and a condition of unseaworthiness arose. Whether, as a matter of verbalization, the case be then termed as involving "a condition of unseaworthiness" or "unseaworthy equipment" should not affect the operative facts.

The quoted passage states that in "the almost theoretical construct" the ship is "admitted to be in all respects seaworthy." In the context of the present case, the passage must be taken to mean that the ship is admitted to be *otherwise* seaworthy, i.e., seaworthy in all respects other than in respect to the condition created by the acts performed pursuant to the order. On the other hand, if the passage means what it literally says— that the ship is "admitted to be in all respects seaworthy"—then of course the doctrine of unseaworthiness could not apply simply by force of the admission *ex hypothesi* that the ship was seaworthy.

A footnote ("note 221") to the above passage declares: "Two of the classical cases did, in fact, present 'almost theoretical construct': The Osceola, 189 U.S. 158, 23 S.Ct. 483 [47 L.Ed. 760] (1903),

* * * and Chelentis v. Luckenback [Luckenbach] S.S. Co., 247 U.S. 372, 38 S.Ct. 501 [62 L.Ed. 1171] (1918), * * *."

. In Chelentis, the issue presented herein was not raised. Mr. Justice Reynolds pointed out specifically (247 U.S. at page 379, 38 S.Ct. at page 502,): "Counsel [for plaintiff] did *not* question *seaworthiness* of ship or her appliances * *." (Emphasis supplied.) Plaintiff had instituted "a common-law action" in the New York State courts for full damages sustained based upon "the negligence and an improvident order of a superior officer" (247 U.S. 378, 38 S.Ct. 502). The cause was removed to the United States District Court on grounds of diversity of citizenship. The Supreme Court held that the defendant's liability was measured exclusively by admiralty law and not by common-law standards; and that plaintiff could not, under exclusive maritime law, demand damages for negligent operation of the ship. See Lumbard, C. J. (concurring) in Bartholomew v. Universe Tankships, Inc., 2 Cir., 263 F.2d 448.

In The Osceola, the Supreme Court held that an injured seaman "could not recover from the owner for injuries suffered through the negligence of another seaman, invoking the fellow servant doctrine of the common law; but it recognized that it was otherwise if his injuries arose from the unseaworthiness of the ship." [According to Judge Learned Hand in Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515, 517.] "The facts were that the master ordered a gangway to be hoisted by a derrick and swung outboard when the steamer was proceeding in a strong head wind, so that she might be ready for an immediate discharge of the cargo on arrival. The gangway, as soon as it swung clear of the side, was turned broadside by the wind and threw down the derrick, which struck and injured the libelant." [According to Judge Ward in Chelentis v. Luckenbach S.S. Co., 2 Cir., 1917, 243 F. 536, 538.]

Mr. Justice Brown explicitly stated that the court was dealing with the case as involving a libel *in rem* and that "it is unnecessary to determine whether the owners would be liable to an action *in personam* * * *" (189 U.S. at page 168, 23 S.Ct. at page 484). Gilmore and Black, supra, 322, concludes that Seas Shipping Co. v. Sieracki, supra, "has come to replace even The Osceola as the *fons et origo* of law." Moreover, The Osceola must now be read in the light of the majority and dissenting opinions in Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 109, 64 S.Ct. 455, 88 L.Ed. 561.

One of the cases heavily relied on by the defendant is Imperial Oil, Limited v. Drlik, 6 Cir., 1956, 234 F.2d 4, certiorari denied 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236, an action in admiralty. The libelant was a shipyard employee and a member of a dock crew engaged in the undocking of respondent's ship. At the time of the accident, the vessel was being repaired and was in drydock. A winch engine on the deck of the vessel was operated by a ship employee who would alternately tighten or loosen the ship's mooring cables that ran from the winches to spiles located ashore in order to move the vessel. No watchman was stationed on the vessel to advise the winchman as to the presence of dock employees near the cables. The ship's winch operator set the winch in motion unexpectedly and without warning, thereby injuring the libelant. The respondent's negligence and the unseaworthiness of the respondent's vessel were placed in issue. The trial judge found that the respondent's conduct in operating the ship's winch without a watchman posted at the port rail constituted "unseaworthiness of the vessel and negligence" (234 F.2d 8). The Court of Appeals held that the finding of unseaworthiness was erroneous as a matter of law, and that liability could rest only upon negligence.

Judge Miller, for a unanimous court, said (at page 8) that—while the doctrine of liability for unseaworthiness has been

extended to non-crew personnel who do a seaman's work and incur a seaman's hazards, although not in the employ of the vessel's owner—"there was no evidence that the vessel or any part of her equipment was defective. The accident arose out of the negligent use of seaworthy equipment. The obligation of the vessel owner to provide seaworthy appliances has not been extended to require the owner to keep those appliances from being used in a negligent manner. If so used, liability rests upon negligence rather than upon unseaworthiness. Burkholder v. United States, D.C.E.D.Pa., 60 F.Supp. 700."

The situation in Imperial Oil was basically different from that in the case at bar. In Imperial Oil the libelant did not assert or prove that any particular piece of equipment was unseaworthy or had become unseaworthy. The libelant erroneously claimed that the vessel had become unseaworthy because the ship's winch had been put in motion without warning to the drydock crew (of which the libelant was a member) and in the absence of a lookout stationed at the ship's rail. Under the circumstances of the case, the court understandably refused to equate operational negligence with unseaworthiness. See Gilmore and Black, The Law Of Admiralty (1957) p. 320, note 221. The court's language must be viewed in the factual context of the particular case.

Burkholder v. United States, D.C.E.D. Pa.1945, 60 F.Supp. 700, cited in Imperial Oil, was a suit in admiralty for injuries to the libelant, who was hurt when a ladder by which he was descending from the ship to the dock fell. The libelant claimed unseaworthiness. The unseaworthiness was allegedly caused by the circumstance that the ladder was not fastened securely or lashed in any way to prevent it from falling and had constituted an insufficient means of access to and from the vessel. One of the reasons for sustaining an exception to the claim for unseaworthiness was that there was no allegation of defect in the ladder or suggestion that it had been made fast by a defective rope. The court said (60 F.Supp. 702):

"The reason it fell was that someone had failed to make it secure by any kind of rope. That was a negligent omission on the part of the person whose duty it was, but it did not render the ship unseaworthy."

It would seem that, if the ladder had been rendered inadequate for the purpose for which it was ordinarily used by virtue of the fact that it was not secured in accordance with accepted maritime usage, there was an issue of unseaworthiness. There is fair ground for arguing that a loose ladder which maritime usage required to be secured, is as unseaworthy as a ladder with a defective rung or a ladder that is inadequately secured by a defective rope.

There are cases which it may be suggested, with all due deference, might well be decided otherwise today, in light of the current doctrinal trend. E.g., John A. Roebling's Sons Co. of New York v. Erickson, 2 Cir., 1919, 261 F. 986.[4] Cf.

4. In John A. Roebling's Sons Co., the plaintiff-seaman was injured in the course of a cargo-unloading operation when his hand caught between the cargo fall and the snatch block. The master "for the sake of speed adopted a new and dangerous" method (at page 986) of discharging the cargo of heavy logs, by directing the crew (including plaintiff) to put a stick under the after ends of the logs, to hold them up while the fall was being disentangled from the snatch block, and the master gave them a defective one, which broke. The after end of the log was caused to drop, bringing a sudden strain on the fall and thereby catching the plaintiff's hand in the snatch block (at page 987).

The district judge had instructed the jury that, if they found that the master had ordered the dangerous method of discharging the logs and had selected the defective and unsafe stick, the vessel was unseaworthy. The jury returned a verdict for plaintiff. In reversing judgment for the plaintiff, the Court held (at pages 987–988):

"So far as the unusual and dangerous method of discharging the cargo is concerned that was an improvident order of

Cox. v. Esso Shipping Company, 5 Cir., 1957, 247 F.2d 629, 635–636.

In Kangadis v. United States, D.C.S.D. N.Y.1954, 121 F.Supp. 842, the libelant-seaman sued the shipowner (the United States) in an action brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741, et seq.

The libelant had been ordered to climb the mast to a platform about 28 feet above the deck. The platform was a small rectangle, about 15 inches by 12½ inches. The libelant was ordered to swing himself from the platform into a bosun chair, which was three feet out from the platform and one foot below it. Libelant objected, saying "that he could not make it as it was too far for him to jump from the platform into the chair" (at page 843). The chair was 30 inches long by 6 inches wide. The vessel was rolling. When the libelant tried to swing into the chair, one leg missed and he sat straddling the chair. In an effort to get entirely into the chair, he grabbed the stay and in so doing he dislocated his thumb and fractured a bone in the right hand. The usual way to do the particular sloshing job that libelant was required to do was for the seaman to get into the chair on deck and be hoisted aloft by a winch or a man on deck. Judge Goddard concluded that the libelant had been required "to perform a difficult and dangerous act" (at page 844) and that the breach of the shipowner's obligation constituted "negligence."

An examination of the Clerk's file in the Kangadis case shows that the amended libel (paragraph Thirteenth of the first cause of action) alleged "that the respondent failed to furnish the libelant with a seaworthy vessel." In respondent's interrogatories propounded to the libelant, the libelant was asked to describe the equipment which, according to the libelant, had been improper and defective (Interrogatory 6). In reply to this interrogatory, the libelant answered: "No claim of defective equipment is made." (Answer 6). In Interrogatory 8, the respondent asked the libelant: "State in detail all respects in which libellant claims respondent failed to provide him with a seaworthy vessel, causing or contributing to the injury alleged in the libel." In reply, the libelant answered: "The vessel was unseaworthy in that it was improperly manned with incompetent officers." (Interrogatory 8)

Thus, it appears that the elements of alleged unseaworthiness were in effect abandoned by the libelant, except for the general charge that the ship's officers were incompetent. Having found negligence, it was not necessary for Judge Goddard also to find unseaworthiness.

In Kangadis, the libelant had not been ordered to handle the ship's equipment in any particular way. There was no question of manipulating the equipment pursuant to orders. Hence, no issue was raised as to the creation of an unseaworthy condition. The danger to which the libelant had been exposed was the danger resulting from the dangerous location, plus the fact that the libelant's hands were greasy (121 F.Supp. 844).

In another case cited by defendant, Blankenship v. Ellerman's Wilson Line, New York, D.C.D.Md.1958, 159 F.Supp. 479, the jury specifically found that the vessel was not unseaworthy. The court held that, in the face of the jury's finding, the shipowner would not be liable for the negligence of plaintiff's fellow employees (who worked for an independent firm of ship ceilers and who were supervised by that firm) committed on

the master, for which the owners are not liable (Chelentis v. Luckenbach S.S. Co., [247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171]); and as far as the use of the stick is concerned, we also think they are not liable. It was furnished for dunnage of the cargo, and not to be used as the master did. * * * There

would, however, be little security for careful owners if, after furnishing a seaworthy ship and proper appliances, they were still liable for the act of the master in not using the proper appliances furnished, or in using them for purposes for which they were not furnished."

the ship and which constituted "negligent operation of seaworthy equipment" (at page 483).

In Donovan v. Esso Shipping Company, 3 Cir., 1958, 259 F.2d 65, plaintiff in a Jones Act, 46 U.S.C.A. § 688, action initially claimed that the unseaworthiness consisted of "the alleged faulty supervision of the boatswain in giving Donovan [plaintiff] the order to top the boom, it being agreed that the gear was not defective. The district court was correct in finding that the evidence did not sustain liability on this theory" (at page 67). The evidence did show that plaintiff's own negligence was the sole cause of the accident. In that respect Donovan resembles The Santa Barbara, 2 Cir., 1920, 263 F. 369, where the Court held that the facts did not make out a case of unseaworthiness because the libelant was presumably as well able as any other crew member to climb the guy and he was not compelled to remain aloft at the smokestack head any longer than he felt able. He fell to the deck when he lost his grip on the guy while descending.

At page 370, Judge Hough said:

"Whether unseaworthiness in law may not be produced by non-use or misuse of good and sufficient adjuncts to or appliances of a good ship, and whether the resulting condition can give use to action for indemnity under the doctrine of The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, are also questions not now before us, because it is plain that libelant, * * *, was set a task not unsuited to his strength, and received (by his own account) injury solely from overtaxing that strength."

The doctrinal trend revealed in the recent decisions of the Supreme Court and the Court of Appeals for this circuit indicates that this area of the law is fluid and evolving. Its expanding boundaries cannot yet be charted in terms of the longitude of precedent or the latitude of policy. The present case falls inside the outer limits of the doctrine of unseaworthiness.

The defendant's motion to set aside the verdict is denied. This decision constitutes an order.

### Plaintiff's Motion

Plaintiff's motion to set aside the verdict on the ground of inadequacy is denied. The Court adheres to the views heretofore expressed upon the trial (see trial minutes) when the jury's verdict was brought in and the plaintiff then moved to set aside the verdict.

A fundamental distinction must be drawn between cases tried before a jury and those tried before the court without a jury. Porello v. United States, 2 Cir., 1946, 153 F.2d 605, 608; United States Fidelity & Guaranty Co. v. United States, 2 Cir., 1945, 152 F.2d 46, 49; The Spokane, 2 Cir., 1923, 294 F. 242, 246–247.

The case at bar, having been tried before a jury, the trial judge is not justified in setting the verdict aside for inadequacy in the absence of some evidence (lacking here) that the jury in rendering the verdict clearly abused its peculiar fact-finding discretion or was clearly influenced by partiality, corruption, passion, prejudice or some misconception of the law or material evidence.

There is no significant indication that this jury's verdict was the result of an oversight, mistake, misconception, misinterpretation or a consideration of elements not within the scope of the action, nor was the verdict "so plainly out of measure as to be 'clearly erroneous.'" Cf. Lukmanis v. United States, 2 Cir., 1953, 208 F.2d 260, 261.

The foregoing principles are established by such cases as Zellem v. Herring, D.C.W.D.Pa.1952, 102 F.Supp. 105; Caldwell v. Southern Pac. Co., D.C.S.D. Cal.1947, 71 F.Supp. 955. See 6 Moore's Federal Practice (2d ed.) pp. 3821, et seq.

To paraphrase what Judge Learned Hand said in Miller v. Maryland Casualty Co., 2 Cir., 1930, 40 F.2d 463, 465,

**830**

the "verdict is within the bounds of reasonable inference from the evidence" and "within the bounds of tolerable conclusion."

Plaintiff's motion to set aside the verdict is denied. This decision constitutes an order.